97 N.J. Super. 149 (1967)
234 A.2d 683
NATIONAL PREMIUM BUDGET PLAN CORPORATION, A CORPORATION OF THE STATE OF MICHIGAN, PLAINTIFF,
v.
NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, A CORPORATION OF THE STATE OF CONNECTICUT, LOUIS J. MARTONE, EDWIN M. ROTHBERG AND PRICE AGENCY A PARTNERSHIP COMPOSED OF LOUIS J. MARTONE AND EDWIN M. ROTHBERG AS COPARTNERS, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided September 13, 1967.
*154 Messrs. Verling C. Enteman and Andrew S. Polito for plaintiff.
Mr. Gordon L. Kent for defendant National Fire Insurance Company of Hartford (Messrs. Budd, Larner, Kent & Gross, attorneys).
Mr. Victor R. King for defendant Edwin M. Rothberg.
STAMLER, J.S.C.
Is an insurance company liable to a finance company under theories of fraud and deceit or negligence for the acts of an insurance agent who submits fraudulent loan applications falsely evidencing the issuance of insurance policies and who thereafter forges verifications of their existence upon which the finance company relies when making loans to fictitious assureds, the proceeds being then converted by the insurance agent to his own use?
In considering similar schemes with minor variations Louisiana and Florida courts have answered in the affirmative. The New York courts and the Court of Appeals for the 8th Circuit deny recovery. New Jersey courts are faced with this question for the first time in the case sub judice.
Subsidiary questions as to defendants other than the insurance company are readily answered when the basic liability as above set forth is determined.
*155 Charging fraud and deceit, or in the alternative negligence, a complaint containing 42 counts was filed by plaintiff National Premium Budget Plan Corporation (hereinafter National Premium), a corporation of the State of Michigan. Sifted to eliminate the excess verbiage in the 76-page complaint, there remain ten transactions upon which recovery is sought amounting to a claimed loss by plaintiff of $177,758.07 and interest if the "benefit of the bargain" measure is applied, or $156,967.07 and interest if calculated by "out-of-pocket" standards. Defendant National Fire Insurance Company of Hartford (hereinafter National Fire) is charged with fraud and deceit or with negligence for the full amount on all ten transactions. Defendant Edwin M. Rothberg, individually and as an alleged partner of Price Agency, stands accused only of fraud and deceit in two of the ten transactions with a claimed loss to plaintiff of $54,114.30. From defendant Louis J. Martone, charged in fraud and deceit, full recovery is sought on each of the ten transactions. Martone pleaded guilty to criminal acts arising out of a number of the transactions, is presently confined in New Jersey State Prison and has not filed any answering pleading. The other defendants deny liability. Plaintiff's demand for a jury trial was waived.
Installment buying has become a way of life for the consuming public. In some cases such transactions are made directly with the seller of a commodity or service and the seller remains the lender throughout. In others money is borrowed directly from a bank or finance company, the borrower using the proceeds of the loan to pay the seller in full and repaying the loan in periodic installments. In such case the seller has nothing more to do with the transaction. Most frequently a third method is utilized: the seller of the commodity or service accepts evidence of the debt from the purchaser and then sells and assigns the documents to a lending institution, the seller remaining secondarily liable in most transactions. This latter method was used in the case at bar. The seller was insurance agent Martone; the *156 purchaser-borrower the assured; the finance company plaintiff National Premium; the commodities were insurance policies of defendant National Fire.
Briefly defined, insurance premium financing is a form of installment lending designed to permit an insured to space the payment of his insurance premium over the major portion of the life of the policy contract. Its principal benefit is to eliminate the advance cash outlay which frequently occurs at an inopportune or financially stringent time. An additional benefit lies in the ability of the assured to make a single payment to the insurance company for multiple years of coverage with substantial reduction in premium charge. For example, the purchase of a five-year policy requires only four times the annual premium; a three-year policy costs but 2 1/2 times.
The insurance company relies preponderantly upon insurance agents or brokers for the business it writes. The insurance premium finance company is dependent exclusively upon the insurance agent or broker for its source of customers. In initiating a loan transaction it does not deal directly with insurance companies or insureds. This is true not only on new business but also on repeat business. In the greater percentage of legitimate transactions, the only direct communications between the insured and the finance company are late notices or notices of payments overdue sent by the finance company to the insured, copy to the agent (but not the insurance company), and payments made by the insured directly to the finance company. The finance company also sends a "welcome letter" and a coupon payment book directly to the insured at the beginning of each transaction.
The insurance agent is the salesman for the finance company and on behalf of the insured applies for the loan directly to the finance company. (One may be critical of the use of the word "loan" instead of "sale," but for reasons hereinafter set forth the sale is a fiction โ the "sale" is clearly a loan approved by the finance company in advance *157 of the initial operation.) After the loan is made subsequent contact between finance company and insurance agent is limited to copies of late notices, but the agent remains liable to the finance company that has received the assignment of the contract and debt with recourse or repurchase. In the event of default the finance company makes a demand upon both insurance agent and insurance company for its collateral, the return of the unearned premium.
Some lending institutions operate in a broad spectrum of financing, relying for collateral on anything from automobiles to zithers. Others specialize. Plaintiff was and is a specialist in the field of "Insurance Premium Financing."
In 1939 in Detroit, Michigan, Green Investment Company was formed by two brothers, Leonard and Robert Green. It operated as a finance company in diversified fields, mostly automobile. In 1958 Green Investment changed its name to National Premium Budget Plan Corporation and restricted its operations to insurance premium financing.
From a very small office in Detroit, with the brothers Green as the only principal officers and about five in clerical staff, a very substantial dollar business was conducted. National Premium placed advertisements in periodicals which would come to the attention of insurance agents and brokers inviting them to make use of its speedy service in financing premiums for insureds on an installment budget plan. Although National Premium remained in small quarters, its business grew to where nationally it was second only to AFCO Incorporated, a New York Company.
In legitimate transactions the operation of the "budget plan" pleased everyone: (1) the insured avoided an advance cash payment or secured a longer term policy at a reduced rate; (2) the insurance agent or broker sold a policy and in most cases a longer term policy, the entire premium was paid at once and his commission was immediately available; (3) the insurance company received its net premium on a policy for a longer term; and (4) the finance company, fully secured by the insured's promise to pay the installments *158 as they became due, supported by the secondary liability or guaranty of the agent or broker and the "return premium" collateral called for by the "premium budget plan" contract, put its money out at interest rates called "service charges" averaging 14.78%.
Prior to May 1957 defendant Martone, as the Louis J. Martone Agency, whose office was located at 516 Park Avenue, Plainfield, New Jersey, was acting as insurance agent for a number of companies. On May 6, 1957 he entered into an insurance agency agreement with National Fire. This agreement granted authority to Martone to receive and accept proposals for contracts of insurance covering risks located in Plainfield and vicinity, limited to such certain classes of risks as National Fire would authorize from time to time; to collect, receive and receipt for premiums "on insurance tendered by the Agent to and accepted by the Company," and to retain commissions out of premiums collected.
The principal office of National Fire was located in Hartford, Connecticut. In a number of cities National Fire had service offices the primary functions of which were to supply appointed insurance agents with stationery and forms, assist them with regard to risks, suggest methods of selling more insurance, and advise on how to assist the prospective assured, including where appropriate a discussion of premium financing. A representative of National Fire told Martone that many banks engaged in such financing, as did AFCO, the largest finance company in the United States specializing in this field. Thereafter Martone placed financing for his clients through AFCO and Passaic-Clifton National Bank. Such financing included but was not restricted to National Fire policies.
In 1959 Martone came across the advertisement of National Premium. The unusual and interesting feature was the emphasis on speed in remitting โ seven to ten days. AFCO had required longer periods, sometimes up to 30 days, before it would remit on a financing request. The *159 National Premium advertisement was addressed to "Fire and Casualty Agents" and spoke of "Premium Budgeting for Your Clients," "no signature required" and "budget by phone." The most attractive feature was "fastest payment to agent โ 7 to 10 days." (Emphasis supplied). Admittedly it was by this appeal that National Premium hoped to make inroads upon its competitors, especially AFCO, number one in the field. Martone wrote for the proffered "kit" of material. Without making any investigation of the stability or repute of Martone or any inquiry as to what and how many insurance companies he served, National Premium promptly dispatched its kit. It contained a sample of a completed form and a number of blank forms of "Premium Budget Request" of two types, one called the "Non-Signature Program" and the other the "Signature Program." The kit also contained an introductory letter, rate charts, and "Silent Salesman" form 123. After stating that the program could be used to budget premiums from $40 to $100,000, the letter went on to say:
"National offers two Premium Budget Programs. Our most popular program is the Signature Program. It is available where the agent prefers a signature arrangement for his insureds. In addition, National offers the Non-Signature Program. Such an arrangement enables the agent to set up the budgeting transaction in a quick and friendly manner โ over the telephone if he desires โ without going to the trouble of getting the insured to sign the contract. Use the sample copy of the completed Installment Contract and the Rate Chart as a guide to fill in the Contract. Fill in the Contract, enclose in an envelope, and drop in the mail-box. Our check will be on its way to you within 7 to 10 days."
The emphasis appears in the exhibit. The rate chart contained the "Budgeting Procedure":

"WHAT THE AGENT DOES:
1. Agent prepares contract, filling in complete information as outlined in the caption on the columns on the contract.
2. Agent records total premiums, budget charge, down payment, and amount of each payment in the appropriate boxes on the contract from the Rate Chart of the appropriate payment plan.
*160 3. Agent dates and signs contract and mails the original to National Premium Budget Plan, 20120 Livernois, Detroit 21, Michigan.
4. Down payment is to be collected and retained by Agent."

"WHAT NATIONAL PREMIUM BUDGET PLAN DOES:
1. Mails coupon book to insured.
2. National mails proceeds of contract (Box A minus Box D) to the agent within 7 to 10 days of receipt of contract.
3. Agent and insured are kept fully informed at all times of the status of the account. When an installment is not paid on time, reminder notices are sent to the insured and a copy to the agent."
The "Silent Salesman" was a form of advertising which National Premium suggested should be affixed to all invoices sent by the agent to his client, who might not be aware of the advantage of a "pay as you go basis" for insurance costs "just as you do other important purchases."
The "Non-Signature Program" is initiated with the execution and mailing by the insurance agent of a "premium budget request form." As its name describes, no signature of the assured is required, although he remains liable on the promises to pay and other covenants. This form carries the following information: total premiums, budget charge, total premiums plus budget charge, down-payment, amount budgeted plus budget charge, amount of each monthly installment, number of months, and due date of first installment. The agent is instructed to collect and retain the down-payment. The names and addresses of the agent and of the assured are to be filled in, together with the identifying code prefix and number of each policy together with the inception date; the full name and address of each insurance company or the name and address of the general agent to whom policy premium is paid; the type of coverage (i.e., fire, casualty, marine, internal marine, auto); the term of the policy, and the separate premium charge for each policy. In the body of the form the following language appears:
"To National Premium Budget Plan Corporation:
The undersigned, on behalf of the insured named above requests National Premium Budget Plan Corporation (hereinafter referred to as National) to advance the premiums on the policies described herein to the insurance companies in accordance with the terms set *161 forth on the reverse side, which are made a part hereof. It is understood that this request, if accepted by National, shall constitute the budgeting agreement between National and the insured." (Emphasis supplied)
The "undersigned" refers to "agent or broker."
The reverse side sets forth the detailed terms of the assured's obligation, abstracted as follows:
In consideration of the premiums to be advanced by National, the named insured: (a) promises to pay National the monthly installment; (b) assigns to National as security all return premiums and loss payments up to amount of unpaid balance due on installment contract; (c) default, such as a failure to pay each separate payment on due date or filing a petition in bankruptcy, accelerates the time periods and the entire unpaid balance is due and all unearned premiums "shall be payable by the insurance companies to National upon National's request"; (d) the insured remains liable for any excess, but National may collect and enforce payment of the indebtedness evidenced thereby without recourse to any security underlying this agreement; (e) warrants that each of the policies listed has been issued to the insured and is in full force and effect, and (f) appoints National as attorney-in-fact in its own name or in the name of the agent or broker to cancel and surrender the policy, collect all unearned premiums or losses payable, and execute lost policy receipts necessary to effect cancellation.
The non-signature form then concluded with "The policy data and the statements made herein are true and correct and a copy of this request has been given to the insured." There then is a space for the signature of the "agent or broker." The insured does not sign, notwithstanding the promises and covenants.
The "Signature Program" form is essentially the same on the face page of the budget request with but one important exception โ the dollar amount of coverage is required to be set forth for each policy. The reverse side has important differences. In this procedure the assured must sign the "premium *162 installment contract" and "Signatures must correspond with the language of the policy/policies and in case more than one person or party is named in the policy/policies, all should sign. In case of signature by an agent or fiduciary, evidence of the authority of the agent or fiduciary must accompany the contract." (Emphasis supplied). Above the signature of the assured the terms are set forth at length and are here abstracted: the assured acknowledges receipt of the policies listed "to which a rider has been attached showing that the premiums thereon have been financed"; the assured promises to pay to the order of the agent or its assigns, at the office of National Premium Budget in Detroit the payments as they become due; the assured assigns to the agent, its successors and assigns, as collateral security, all unearned premiums or loss payments and agrees that the agent or assigns are entitled to possession of the policies until payment is made in full, but the assured may have "temporary possession" until demand by agent or assignee of agent. The remaining provisions are similar to those set forth in the "non-signature" contract.
Immediately below the installment contract there appears the "AGENT OR BROKER'S ASSIGNMENT AND CERTIFICATION," which is signed by the agent or broker:
"For Value Received, the undersigned hereby sells, assigns and transfers all his right, title and interest in and to the foregoing contract and in and to all sums payable thereon and collateral security covered thereby to NATIONAL PREMIUM BUDGET PLAN CORPORATION, Detroit, Michigan, its successors and assigns, and warrants that said instrument is genuine and in all things what it purports to be; that the undersigned has good title to said contract and the right to transfer said title, that the undersigned has no knowledge of any fact which might impair the validity of said instrument or render it less valuable or valueless; that the amount stated in Box E on the reverse side hereof is correct; and that there is no defense to it. If any of said insurance companies shall become insolvent, suspend business or cease to be qualified to do business, the unpaid balance due hereunder shall be immediately due and payable. In such event National may immediately terminate the agreement and the unearned premiums on the policies listed above shall be payable by the insurance companies or the undersigned agent to National upon *163 National's request. If the policies listed on the reverse side hereof are either audit or reporting form policies or policies subject to retrospective rating that the deposit or provisional premiums are not less than the anticipated premiums to be earned for the full term of the policies. These warranties and representations are made to induce the assignee to purchase this instrument, and should any difference or dispute arise as to the truth of any statement made in connection with this transaction, the undersigned agrees to repurchase this instrument for the amount owing thereon, plus costs and expenses incurred by the holder in attempting to collect the same.
The undersigned certifies: (1) that all of the assureds named in the policy/policies covered hereunder are fully described on the reverse side hereof, and (2) that all of the policy/policies listed on the reverse side have been issued or signed by the undersigned, except as follows:
 Policy Prefix
 and Number
 Insurance
 Company
 Name of
 Agent
 Address of
 Agent
 Agent or Broker โ Sign here
 ___________________________________
 By ____________________________
 Title"
Although none of the transactions here sued upon were in the "Non-Signature Program", the earlier "non-signature" loans were necessary stalking horses for the subsequent swindle.
Nine of the ten transactions on which recovery is sought were in the "Signature Program." The tenth was in a procedure called "Signature Program โ Profit Sharing Plan." This was initiated by plaintiff in January 1963 and gave the agent the right to share in the profits of the transaction. The profit sharing form, first used in January 1963, is almost identical to the "Signature Program" contract except that for the first time the following language appears above the signature of the assured: "The insurance agent or broker through whom the above policies were issued is not the agent of National." (Emphasis supplied).
*164 In October 1959 Martone, having received his kit, placed his first request on the "Non-Signature Program" form. It sought financing of premiums on a number of policies issued by more than one insurance company, including a National Fire policy. When more than two weeks had gone by without a remittance from National Premium, Martone, remembering the promise of "fastest payment" and "speed โ 7 to 10 days," called Detroit to find out why the delay had occurred. National Premium advised, and Martone learned for the first time, that no remittance would be forthcoming until each of the insurance companies named in the request for financing had verified directly to National Premium the existence of an authentic issued policy conforming precisely to the term, coverage and premiums listed in the loan application. Martone was told that National Premium sends a "Notice of Premium Financed" and a "Verification Acknowledgement Postcard" to each company; that no check issues until all cards are received by National Premium, and that the delay was due to the fact that National Fire had not yet responded, although the other listed companies had.
Martone immediately went to William A. Bray at the local service office of National Fire, then at Room 1813 of the National Newark Building in Newark, New Jersey. Bray was the manager of this office and Martin Bross was assistant manager. The greater percentage of their work was in the field, outside of the office, visiting the approximately 150 insurance agents of National Fire in New Jersey. One function of Bray and Bross was to encourage the insurance agents to push National Fire policies over the policies of other competing companies. Their duties were to assist in the opening and closing of agencies; supply published material, stationery and policy forms, and advise on how to sell longer term policies; review of risks proposed, and this service included all types of helpful suggestions, including how premium financing operates. In the office at the time of Martone's visit there were employed two girls, one of whom was Eileen Schurr. She was serving as Bray's secretary *165 and file clerk, and as the general overseer of incoming mail.
Martone told Bray of his conversation with National Premium. Bray stated that no verification or acknowledgement could be made by the Newark office; that all such verifications were required to be made in the Hartford home office of National, for it was there that the "dailies" were maintained. "Dailies" are in common use by insurance companies and contain information on a daily basis of the policy number, the assured's name and address and the agency selling the policy. This information is transmitted to Hartford daily and no record of its contents was maintained in Newark. This applied to all service offices on the eastern seaboard. (In the mid-West the various local service agencies transmitted dailies to the National Fire office in Chicago.)
Martone was informed that Bray had no authority to sign the verification acknowledgement card. Bray, in Martone's presence, called Hartford and spoke to an officer of National Fire, who authenticated the existence of the policy in question. The card was thereafter forwarded to National Premium in Detroit from Hartford bearing the signature of an underwriter.
After a few legitimate transactions for minimal borrowings of less than a thousand dollars on the "Non-Signature Program," Martone suggested to Green at National Premium that the "Notice of Premium Financed" and form of verification postcard be sent directly to Hartford from Detroit, and remittance to him could then be expedited. Green testified that to prevent collusion and fraud and also to have the latest timely information on whether an agent did or did not exist, National Premium had an unrelenting requirement that the verification forms must be sent to the local office of the insurance company nearest to the agent, and it mattered not whether it was a branch or service office. Green further stated that all requests for financing came to his personal attention and that whenever Martone on an application used the Hartford address, Green personally *166 deleted that address and inserted the Newark address. Green refused to adopt Martone's suggestion.
It was at about this point that Martone first realized that a swindle could be perpetrated very easily on National Premium and that the opportunity to do so was handed to him by National Premium. Realizing that Bray and Bross spent considerable time on the road, his scheme would work if there were a way to intercept the mail addressed by National Premium to National Fire at Newark before it was forwarded to Hartford. Martone had many blank forms for requests for financing supplied to him by National Premium. All that was required to make the scheme work was for him to secure the "Notice of Premium Financed" and the "Verification Acknowledgement Card" without the knowledge of National Fire. Had National Premium complied with Martone's suggestion and sent the notices and verification cards to Hartford, Martone's plan could not have succeeded.
With all the charm and sincerity characteristic of a successful confidence man, Martone induced Miss Schurr to turn over to him envelopes bearing the return address of National Premium, persuading her that the letters were simply "cancellation of business." Miss Schurr and the other Newark employees either knew nothing or little about premium financing. Miss Schurr either personally handed these envelopes to Martone, who timed his visits to the Newark office, or placed them in an outer envelope addressed to Martone at his Plainfield office. This was done without the knowledge of Bray or Bross.
Having succeeded thus far, Martone decided to put through a few "legitimate" transactions, to be followed by "illegitimate" transactions and then by the "fraudulent" transactions. A few truly legitimate transactions were put through. Leonard Green sent the "Notice of Premium Financed" form to National Fire at Newark and the acknowledgement card was returned to Detroit bearing the postmark "Hartford, Connecticut." Green testified that on all transactions of National Premium with any insurance company he paid special *167 attention to the postmark and the signature on the verification postcard to make certain that the agent and the assured were not in collusion. He noticed that cards sent to Newark at the beginning came back to National Premium bearing the Hartford postmark and a signature by someone from Hartford whose title was "Underwriter." A "legitimate" transaction was one where a policy did actually issue and Hartford had a record of its issuance. A few legitimate transactions took place before Martone induced Miss Schurr to turn over the mail to him.
Now that he had Miss Schurr as the intercept, Martone decided to make a test run or two. These are referred to as the "illegitimate" transactions. Martone would actually prepare but not deliver a National Fire policy for a named assured, who never knew that his property was insured against fire loss. Using the "Non-Signature Program," Martone requested financing from National Premium. A "Welcome Letter" and a coupon payment book were sent by National Premium to the assured named in the budget request, to a postoffice box or to Martone's own address. At the same time National Premium sent the "Notice of Premium Financed" and the acknowledgement card to Newark. Miss Schurr intercepted the mail and turned it over to Martone. Martone completed the form and forged the signature of William A. Bray, writing the title "Manager" in the place designated. Martone then mailed the postcard from Newark. The card was received, inspected at National Premium by Leonard Green, who issued a check payable to "Louis J. Martone Agency." In no case was the check made payable to the primary obligor, the insured, or jointly to both the insured and Martone.
Each month Martone faithfully sent National Premium a coupon from the coupon payment book, accompanied by a Martone Agency check. In none of the Martone transactions was payment ever made by check of the insured. The premiums financed in the illegitimate transactions were very small and served as an investment by Martone in research to *168 learn if his scheme would work or if it needed additional research and development. During the installment term of the first illegitimate transaction Martone started another, and then another, using the proceeds received from National Premium on the subsequent transactions to pay National Premium each installment as it became due on the earlier contracts still outstanding. The plan was working smoothly and regularly.
The time was now ripe for the full treatment. The first fraudulent transaction was undertaken. Using fictitious names or names of living persons who were unaware of his plan, Martone filled in both non-signature requests and signature request forms, and designated prefixes and policy numbers (chosen at random) for a variety of types of coverage in ever-increasing amounts, naming National Fire as the carrier. These were sent to National Premium from time to time, who obligingly struck the Hartford address and inked in the Newark (later, the East Orange) address of the National Fire service office. On later requests Martone happily complied with National Premium's directive and inserted the local address of National Fire. The "Notices of Premium Financed" and the "Verification Acknowledgement Cards" found their way into Martone's hands through Miss Schurr and later Miss West, another National Fire local employee. Martone completed the verification card with the forged signature of "William A. Bray, Manager" and mailed it from either Newark or East Orange, wherever the local office was then located. Like clockwork, and with the expedited speed as originally promised by National Premium in its advertisement, the checks payable to the Louis J. Martone Agency were received by Martone from National Premium and deposited to his account.
There was no need of a remittance or credit to National Fire, for no policy whatsoever had ever issued or for that matter ever been prepared by Martone. Martone did not find it necessary to go through the mechanics of typing up a fictitious insurance policy. He continued to repay on older *169 contracts, steadily increasing the amount of the new borrowings, using part of the new loans to repay the older obligations.
In 1961 National Premium notified its "producers," as it called its business getters like Martone, that all requests for amounts over $500 thereafter would have to be submitted using the "Signature Program." The "Non-Signature Program" could only be used for borrowings of less than $500. This did not for even one moment put Martone off his stride. Following instructions, since all amounts now requested were considerably in excess of $500, Martone now used and forged the names of unknowing living persons to the contracts, or used and signed fictitious names. With apparent unconcern, vacant lots or imaginary buildings or nonexistent locations were listed. Martone's early and easy success made him careless. In listing policy numbers he abandoned sequential numbering; his fictitious corporate assured had new and different fictitious names of individual officers; the premium rates differed substantially for the same amount and type of coverage, and the "type of risk" were risks which Martone was never authorized to write and were not handled by National Fire. With growing abandon Martone forged Bray's name in a number of different ways: "W.A. Bray" or "Wm. A. Bray" or "William A. Bray," and on one occasion forgot that Bray's middle initial was "A". Perhaps the use of the word "forge" gives too much credit to Martone, if forge is taken to mean to imitate or copy falsely. Martone may have been an adept swindler, but he was a very poor forger. Martone's penmanship differed from signature to signature, and this is apparent to even the untrained eye. Martone continued to forge Bray's name long after Bray had left the East Orange office of National Fire for a position in another state.
All but the last two transactions were made in the name of Louis J. Martone Agency as "agent or broker." Martone testified that in January 1963 he became concerned that National Premium might become suspicious because of the *170 frequency and ever-increasing amounts of business originating in the Martone office. In the last two transactions the agent was named as "Price Agency," and to these applications Martone forged the name of "C. Blandek," a 17-year-old girl working in his Plainfield office. Martone did not want his name to appear anywhere on these two borrowings, which totaled over $50,000 and he found what he considered a safe vehicle. In 1961 Martone suggested to defendant Edwin M. Rothberg, a business neighbor, that they create a business for two young men in their respective offices which would engage in the writing of "bastard" insurance. This type of insurance was substandard and less acceptable to the consumer, and involved insurance at reduced cost with direct billing and limited coverage. Rothberg had had an insurance broker's and agent's license for 25 years. The choice of "Price" in the trade name was to suggest to the consuming public a cut-price or cheap insurance. A trade name certificate was filed by Rothberg and Martone in the Union County Clerk's office on July 17, 1961. It stated that Martone and Rothberg were about to engage in a partnership for real estate and insurance under the name of Price Agency. One newspaper advertisement was inserted by Price Agency and no business resulted. In fact, Price Agency did not write a single policy, had no bank account, and never engaged in a business transaction involving real estate or insurance or any other business. The name lay dormant until 1963, when Martone personally found need for it. Martone had opened a bank account in the name of Price Agency with the Plainfield Trust State National Bank to be used as a depository for the remittances. It was not until after the account had been put to its use in the fraudulent scheme for the deposit of National Premium checks payable to Price Agency in the last two transactions that the bank required a certified copy of the trade name certificate, which by this late date had had Rothberg's name removed. Rothberg did not participate in any National Premium activity, and the first communication from National *171 Premium to Rothberg was the service of the summons and complaint in the instant case.
Martone's bubble burst when he issued a check to National Premium in payment of one of the transactions and it was returned on February 8, 1963 marked "insufficient funds." Plaintiff's suspicion was now aroused for the first time. Green immediately called the East Orange office of National Fire and the shock came. Bray was not there, having left in March 1962; Bross, now manager, knew nothing about any of the financed transactions. National Premium investigated. The New Jersey Department of Banking and Insurance and the county prosecutor explored. Martone was subsequently indicted on many counts for defrauding National Premium, pleaded guilty and is now serving his sentence.
After the telephone call from Green to Bross, National Fire cancelled the Martone Agency agreement and so notified the Department of Banking and Insurance.
Thereafter, on January 15, 1964 National Premium filed its complaint seeking to recover on the last ten transactions upon which installments remained unpaid. Plaintiff does not offer to return or give credit for the profits made on the illegitimate transactions upon which payments were received in full and substantial profits realized.
National Fire denies responsibility for the fraud or deceit, denies negligence and asserts contributory negligence. Rothberg denies liability for fraud and deceit, (He is not charged with negligence.) Martone has failed to answer the complaint.

THE TEN TRANSACTIONS
All ten transactions involved in the litigation were initiated by Martone and financed by National Premium within a one-year period; the earliest contract was dated January 20, 1962, the last January 10, 1963. The nonexistent policies purportedly insured property in excess of $7,000,000. The premiums necessary to pay for such coverage exceeded *172 $260,000. The total repayments anticipated, including "Budget charges," amounted to $280,423.72. The monies remitted to Martone by plaintiff totalled $259,632.12. National Fire received not one dollar from Martone on National Premium advances on the illegitimate or fraudulent transactions. The amount repaid to National Premium by Martone on these then contracts was $102,665.05. The balance remaining due on the contracts is $177,758.67. This figure includes National Premium's profits, and plaintiff seeks this amount plus interest under the "benefit of the bargain" rule. In the alternative, the amount of loss claimed as "out-of-pocket" is $156,967.07. Each of the ten transactions upon which suit is brought is considered hereinafter in detail.

TRANSACTION No. 1
This "Signature Program" contract is dated January 20, 1962. It was received by Leonard Green in Detroit on January 22, 1962. The agent or broker is Martone, whose address is shown as 516 Park Avenue, Plainfield, New Jersey. The assured is Price Associates, Inc., P.O. Box 701, Plainfield, New Jersey. In the appropriate place for the signature the typed name of the assured corporation appears followed by the purported signatures of two fictitious individuals, George McVail and Walter E. Price. Although the contract required it, no evidence of their authority by or relationship to the corporate assured was noted. Three policies for use as security were listed, all National Fire. One was a casualty policy and the other two were fire. The total coverage was $230,000, for which the total premiums amounted to $21,235.12, with a budget total charge of $1,529.30. The down payment "to be collected and retained by agent" was $2,123.50. The total budget charge plus amount budgeted was $20,640.80, to be paid in 12 monthly installments of $1,720.06. The remittance on this contract to Martone from National Premium was to be $19,111.62. The check to Martone, however, was in the sum of $22,391.62. *173 The reason for the higher amount became clear when an additional transaction (not included in plaintiff's claim) processed the very same day is examined. This too was a "Signature Program" contract created by Martone, dated January 20, 1962 and received in Detroit by Green on January 22. The agent and the assured are the same as that in the accompanying transaction. Examined and approved by Green at the same time, the check to Martone covers remittance for both transactions. Green's handwriting admittedly appears on both contracts. Received and processed the very same day, Green ignored the warning which should have caused him great alarm. In the separate requests the same numbered policy, National Fire policy 671441, was listed as collateral. One request on policy 671441 had a policy date of 1/18/62 covering casualty in the amount of 100/300 and expiring 1/18/65, with a premium charge of $8,344.72. The other request on policy 671441 had the same policy date covering casualty in unspecified amount, described as "auto fleet coll." and expiring 1/18/63, with a premium charge of $1,924.75. Since only eight monthly payments were scheduled for the one-year policy, this latter transaction was fully paid off by Martone to plaintiff before the frauds were uncovered. Since the check included amounts advanced on both contracts (with notation on the reverse side of the check), it is inconceivable that a finance company president using ordinary care in processing the transaction would not have been alerted. The inconsistent terms and coverage for the very same policy used as separate collateral sounds a clarion call. The perfidy of Martone could have been discovered then and there.
The next step was the mailing by National Premium of "Notice of Premium Financed" and the "Acknowledgement-Verification Card" forms to the East Orange service office of National Fire. This was done for both contracts on the same day. On the notice for one transaction the policy number was 671441, with an inception date of 1/18/62 for a term of 3 years and a premium of $8,344.72. On the second, *174 the policy number was 671441, with an inception date of 1/18/62 for a term of one year and a premium of $1,924.75. The "Notice of Premium Financed" in each case contained the following language: "We will finance the premium if you assure us the policy is issued in accordance with the description shown above * * *," (Emphasis supplied)
Each return card carried the forged signature of Bray, the same policy number and a postmark on each showing a mailing from East Orange on January 24, 1962 at 3:30 P.M. Green repeatedly testified that he personally examined each verification card upon receipt to eliminate the possibilities of fraud by agent or assured. On the face of the contracts, the notices and the returned postcards there appeared sufficient inconsistencies to have set in motion some inquiry. No investigation whatsoever was conducted by anyone from National Premium on these transactions or any others.
The ledger card on this account shows clearly that no installment was ever paid on its due date, and that late notices, cancellation notices and releases of cancellation notices were sent to the fictional assured and to Martone.
From the proceeds of later borrowings all but one installment had been paid in February 1963, the time of the discovery of the fraud. Plaintiff claims only $1,720.07 on this item. Since this was the first of the ten transactions upon which suit is brought, had plaintiff noted any one of the patent inconsistencies, discrepancies and noncompliance by Martone, the remaining nine transactions could never have come into existence.

TRANSACTION NO. 2
This signature program contract is dated March 20, 1962 and was received in the National Premium office a day earlier. The agent or broker is again Louis J. Martone Agency, 516 Park Avenue, Plainfield, New Jersey, and the assured is designated as:
*175
 "Property Management of N.J.
 c/o Louis J. Martone Agency
 516 Park Avenue
 Plainfield, N.J." (Emphasis supplied)
In an earlier fictitious "Non-Signature Program" contract dated February 1, 1961 with Martone as agent, the assured is designated as:
 "Property Management of N.J.
 Louis J. Martone, Agent
 516 Park Avenue
 Plainfield, New Jersey." (Emphasis supplied)
The total coverage was $432,000.
That exploration was warranted is clear when this contract is examined, for Louis J. Martone appears both as insurance agent and as agent of the assured. Green processed this contract personally, as he did all others. He should have also noted that the requirements of National Premium had not been observed. The signature of Martone and the fictional Joseph Auster as representatives of the assured were not accompanied by the requisite evidence of authority.
The testimony of Green was specific: on the day a contract is received, the "Notice of Premium Financed" and the acknowledgment form are mailed to the insurance company. This contract, dated March 20, was received in Detroit on March 19. The notice and card were mailed from Detroit to East Orange on March 19. The verification with the forged signature of Bray which should have carried a Hartford postmark, carried a postmark of East Orange at 3:30 P.M. on March 21. The check, which does not issue until the verification is received, is dated March 23. The remittance was received by Martone in the sum of $25,198.20, and not one installment on this contract was paid on its due date. At the time of the discovery of the fraud $20,413.80 had been repaid by Martone by way of late payments and there remains claimed $6,804.54.
This transaction took place almost two months to the day after Transaction No. 1 was initiated.

*176 TRANSACTION NO. 3
Again almost two months to the day, another request came through. This contract asked for a remittance of $23,066.10 based upon total premiums of $25,629.35 for $465,000 coverage. The policy numbers for fire coverage differed substantially from the series on the two prior contracts.
For $75,000 coverage on a three-year fire policy a premium cost of $3,640.20 is used. For a lesser coverage ($65,000) for the same term in transaction No. 1, a premium cost of $6,445.20 is set forth.
For a casualty 100/300 policy, transaction No. 3 shows a premium charge of $48,343.60, whereas for the same coverage transaction No. 2 exhibits a charge of $11,471.20.
This contract was received May 14, and the verification card is postmarked May 16 and the remittance check May 18. The payments under this contract were never kept current and many late notices were mailed to the assured and Martone.
At the time the frauds were discovered, Martone had returned $16,607.76 and there remains claimed $8,303.66.

TRANSACTION NO. 4
Martone apparently was doing so well and so easily that on this occasion he did not let two months elapse. A little more than one month later he submitted a new request for a remittance of $24,228.00 on coverage amounting to $207,000, with premiums of $26,920.44.
Here the assured was a living person, a friend of Martone's, who agreed that upon receipt of any mail from National Premium addressed to the assured, he would turn it over to Martone. Like the prior accounts, this, too, became delinquent in the first month. The policy numbers for fire now carried a prefix "F," unlike many of the prior transactions.
*177 Martone, out of the proceeds of later contracts, reduced the indebtedness by $15,263.36, and there remains claimed $10,902.24.

TRANSACTION NO. 5
Almost one month to the day later, July 9, a new request was submitted. The total premiums were $23,357.88 and sought remittance of $21,021.30. The agency was Martone and the assured was designated as "Benmar Holding Company" at 512 Park Avenue, Plainfield. After the typed name of Benmar appears the forged signature of Nicholas P. Martone with no evidence of authority. (On June 8, 1961, 11 months before, Martone had submitted a budget request contract for the same Benmar Holding and this was purportedly signed by Nicholas B. Martone.) The covered risk was $1,346,000. The forged signature of Bray on the two Benmar account verification cards are utterly different. One is signed "Wm. A. Bray" and the other "William A. Bray" and again the style of writing is different.
Martone paid $11,359.80 to National Premium, which now claims a balance of under $11,347.56 under the contract.

TRANSACTION NO. 6
Two months later, September 27, Martone again requested financing for Benmar Holding Company. The nine policies listed were fire, all National Fire, totaling $300,000 coverage based upon premiums of $26,250.48, for which remittance was sought in $23,625. Purportedly signing for Benmar this time was Louis A. Benucci, with no evidence of authority. All policies designated terms of five years, and a comparison of the similar coverage on prior transactions reveals a substantial discrepancy in rates. Anyone remotely familiar with the insurance business would have asked some questions. Only three installments were paid by Martone, all late payments, and there remains claimed on this contract $19,135.25. The forgery of the name of Bray again *178 was very inartistic. It took only from September 28 (the Detroit mailing) to October 2 (the East Orange mailing) for the verification to be executed and mailed, notwithstanding that nine separate and distinct policies required verification.

TRANSACTION NO. 7
One month later, October 29, National Premium received another request from Martone. The coverage amounted to $600,000, based on premiums totaling $46,208.40, upon which a remittance of $41,587.20 was paid to Martone. The assured on this occasion was "D.G. Associates, Inc." Purportedly signed by a David Goldberg for the corporation, no evidence of authority accompanied the request. No alarm was created by the speedy return of the verification card from East Orange, although nine policies had to be checked and verified. Again the apparent difference in the Bray signature from the one just a month earlier raised no question in Green's mind, although he personally examined each and every verification card.
Only three installments were paid, each delinquent. Although each monthly payment was $3,742.87, on Martone, using the proceeds from Transaction Nos. 9 and 10, sent his check January 29, 1963 to National Premium for $7,485.74. There remains claimed $33,685.73.

TRANSACTION NO. 8
This request was received by National Premium on December 10. The coverage amounted to $800,000, the total premiums $30,756.21, the amount remitted to Martone $27,680.40. The purported signature of Bray is a very poor copy of the prior signature and differs in the use of initials. The verification card bears no postmark, but the speed on this occasion broke all prior records. The request was received December 10, the "Notice of Premium Financed" December 10; the check issued December 14. The only *179 installment paid, $2,491.20, was received by National Premium on January 29, 1963. On this transaction $27,403.18 is claimed.

TRANSACTION NO. 9
A departure from the usual is here exhibited. Martone testified that he was now concerned that National Premium would become suspicious, and to throw them off the track he decided to submit this and the next request for financing without his name appearing anywhere. He decided to use the name of "Price Agency" as agent. The address was 516 Park Avenue, Plainfield, the same as that of the Louis J. Martone Agency which had been used in all prior transactions. He departs from sequential numbering and reverts to lower policy numeration. Using the "Signature Program" forms which had been sent to him in his kit, Martone now makes the agent or broker "Price Agency" at Martone's address. When the blank forms had been sent by National Premium to Martone there was no coding for forms sent him. The use by "Price Agency" of a Martone-coded form would have opened the entire web. There was no such cross-check procedure. The coverage was for $1,445,000, with total premiums of $30,202.95, upon which National remitted to Martone in the name of the Price Agency $27,181.80. The form was received in Detroit on January 9, 1963, and the "Notice of Premium Financed" together with verification cards were sent the same day. The card is postmarked East Orange, January 12. The assured was Bon-Anno Holding Corp., with the forged or fictitious "Joseph Bonanno, Pres." appearing. Signing for "Price Agency" was C. Blandek. Unknown to Green, she was a 17-year-old clerk in Martone's office.
Green admits that Price Agency was new to him; that he made no check to see if any such agency was listed in any field directory; that he knows now that Price Agency had no such listing. Green also made no inquiry of the New Jersey Department of Banking and Insurance to determine *180 whether Price Agency was an authorized agent for National Fire. For a statutory fee of one dollar Green would have been told by the Department that Price Agency was not authorized to write for National Fire. Since the first installment on this contract did not become due until February 8 (the day the fraud was discovered) the entire amount is claimed by National Premium, $29,356.48.

TRANSACTION NO. 10
National Premium had now initiated its profit-sharing plan and invited Martone to use it. Martone in this last transaction made use of the "Signature Program-Profit Sharing Plan." He wanted to share in National Premium's profits. This request was received one day after transaction No. 9 by National Premium. It was again in the name of "Price Agency" as agent or broker, with the same Martone address. The coverage was $900,000, with premiums at $29,925.06 and a requested remittance of $26,932.50. The assured was:
 "M.M. Trautwein
 Colonnades Inc.
 25 Clifton Avenue `D'
 Newark, N.J."
National Premium received the contract on the same day. Green drew an ink line through the name "M.M. Trautwein," but failed to notice that on the signature page under the typed "Colonnades Inc." appeared the forged signature of M.M. Trautwein without the required designation of authority. Signing for Price Agency again was "C. Blandek." The forged signature of Bray on the verification card again differs from the immediately preceding transaction of "Price Agency."
No installment was due until February 10 and therefore none was paid by Martone. The amount claimed by National Premium on this transaction is $29,099.88. This was Martone's last transaction.

*181 THE TESTIMONY
Stuart Chalifoux, chief investigator in the Department of Banking and Insurance under executive order not to reveal details of the Department's investigation of the Martone frauds, testified that the Louis J. Martone Agency was first licensed in 1956 and the cancellation of license occurred in 1963 after the discovery of the fraud. He also testified that Martone had been the authorized agent for 18 different insurance companies during the period in question.
Martin Bross, called by plaintiff, testified that when he worked for National Fire in its Philadelphia office verifications were sent from Hartford to the finance company. The same was true when he was transferred to Newark. "To insure verification" all such requests received at the Philadelphia and Newark offices were sent to Hartford (where the dailies were maintained) and Hartford would mail them to the finance company. Bross came to Newark as assistant manager under Bray in 1960. The girls in the office handled the mail, but no business other than typing and preparing the forms for the opening and closing of agencies. Bross was not too familiar with premium financing forms, but on occasion he might assist an insurance agent in completing one. If he knew of a bank or finance company that charged lower rates for financing, and if an insurance agent asked, he would tell him. The instructions to the girls in the office, including Eileen Schurr, required that premium financing mail go to Hartford. From his limited experience he was aware that AFCO, Broadway Bank, First Pennsylvania Company and National Newark & Essex Bank engaged in premium financing. All mail with regard to these went to Hartford from the Philadelphia and Newark offices of National Fire.
Bray, presently working in Paris and not available to testify at the trial, was deposed and told of his experiences. He was the manager of the Newark office and later the East Orange office of National Fire. During the trial counsel *182 stipulated that the Newark area service office of National Fire office was at 744 Broad Street, Newark, from May 19, 1959, to April 19, 1960; then at 110 Halstead Street, East Orange, until February 15, 1961; then at 160 Halstead Street until February 14, 1964, and thereafter at Harrison Street in East Orange. Bray stated that in both Newark and East Orange only the inland marine dailies remained; all other dailies went to Hartford immediately; it was, therefore, absolutely impossible to verify the existence of a fire policy or casualty policy, let alone the numbers, expiration dates, and the amount and type of coverage. Neither Miss Schurr nor Miss West, or any other girl, was ever authorized to turn over mail addressed to National Fire to Martone. On one occasion he recalls Miss West interrupting a meeting, standing at the door of his office, and asking whether she was to send an envelope she held in her hand to Martone, and he responded that if it belonged to Martone, she could send it to him. Bray stated that he was never aware of any of Martone's devious practices, and in this Martone concurs. Bray never signed a single acknowledgement card; all were admitted by Martone to be forgeries.
Miss West, by way of deposition, testified that she did ask Bray on that one isolated occasion in the East Orange office about sending a letter to Martone, and plaintiff argues knowledge on the part of Bray of the contents because of the small physical layout of his office where he was meeting with two or three other men. Miss West did not come to work for National Fire in New Jersey until the end of July 1961, and by that time many of the illegitimate and fictitious transactions were either completed or in the process of completion through the assistance which Miss Schurr gave to Martone.
Mr. Turnbull of the Plainfield Trust State National Bank testified that on December 13, 1962 an account was opened in his bank in the name of "Louis J. Martone t/a Price Agency" and that the bank did not receive a trade name *183 certificate for this account until late in January 1963, shortly before the fraud was discovered.
Defendant Rothberg testified, and the essential parts are set forth above โ generally to the effect that he was never associated in any business venture with Martone except in signing a trade name certificate which was never used and applying for a license.
The two principal witnesses, both called by plaintiff, were Martone and Leonard Green, president of plaintiff corporation.
Martone, brought from State Prison to testify, acknowledged that in each of the illegitimate and fraudulent transactions he knew that the representations made to National Premium were false and that they were false at the time he made them; he made them to obtain money and expected National Premium to rely upon them; as a result he did receive monies from National Premium. Martone agreed with what plaintiff had stated in its opening: that but for his ability to get his hands on the mail, the scheme would not have worked. In only a few instances did Martone's testimony stand at odds with Green's.
The earliest transactions, the legitimate ones, were verified by a postcard received in Detroit postmarked Hartford and signed "F.S. Paisley, Underwriter." It was Green who insisted that the "Notices of Premium Financed" and the verification postcard form go to Newark and not directly to Hartford. It was this decision which enabled Martone to embark on his plan, for had the forms gone directly to Hartford from Detroit, Martone would have been unable to intercept the mail. Martone further states that Bray never knew that the mail was being turned over to him. Each and every payment on legitimate, illegitimate and fraudulent transactions was made to National Premium on checks of Louis J. Martone Agency accompanied by the coupon from the book that was to have been in the possession of the assured. Green later testified that in the ordinary course of National Premium's business 80% of all payments came *184 directly from assureds and not from agents. The Martone transactions were therefore out of the ordinary course. On the requests for financing, Martone chose numbers at random for the nonexistent policies. Martone admits that had National Fire been given one opportunity by National Premium to check the numbers, the fraud would have been immediately discovered. Although many of the policies listed in the financing contracts were referred to as "casualty" policies, Martone had never been given authority by National Fire to write "casualty." Neither Miss Schurr nor Miss West ever questioned Martone about what was contained in the envelopes he persuaded them to turn over by subterfuge. Martone testified that on no occasion did any inquiry come to him from National Premium about financial status or actual existence of any assured, location of property or inordinate increases in coverage in the millions of dollars. National Premium never inquired about the similarity of names of assureds, the use of Martone's own name as an assured, the failure to use sequential numbers, Martone's relationship to Nicholas Martone, or the failure to submit evidence of authority where the financing was for a corporate assured. National Premium never asked Martone for a copy of his National Fire agency agreement. Martone, as an insurance agent for National Fire and for many other companies, paid his own rent, telephone, office equipment and other necessary expenses. Martone never received any inquiry from National Premium as to who "Price Agency" was, notwithstanding the same address in Plainfield was used and "Price Agency" had been named in earlier transactions as an assured and later appeared as a sponsoring agent or broker. Price Agency had never requested a kit or forms from plaintiff. The money Martone received from National Premium was used in part to pyramid his contracts by paying some installments. The remainder was lost on a "retrospective insurance" venture with a Texas company.
*185 The testimony of Green is supported only in part by the documentary proof. It is contraverted in many important respects by exhibits introduced by plaintiff.
The history of National Premium and its method of operation has been detailed. Green testified that he and his brother, the officers of plaintiff, had no experience in the insurance business. It was his opinion that 25% of insurance agents who are in business as of one year are not in business the next and therefore, "as a matter of judgment," he determined that "Notices of Premium Financed" and verification cards were to go to the local rather than the home or principal office of the insurance companies. The local service office, he thought, would know better and more quickly when an insurance agent went out of business. His practice was to examine the appropriate insurance directory, similar to the New Jersey Field Directory of Insurance Agents, and see if the submitting agent was listed. However, he conceded that he made no such examination to see if Price Agency was listed. It was not.
Notwithstanding the fact that National Premium was doing more than a quarter of a million dollars worth of financing on over $7,000,000 coverage through one agent in one year in New Jersey, Green's company, from an abundance of frugality, purchased the New Jersey directory only every other year. Green asserted that to make an investigation of an assured or agent, as was suggested on cross-examination, would be too expensive and put National Premium out of business. This seems incredible. An inquiry addressed to the Department of Banking and Insurance of New Jersey, at a cost of one dollar, and Green would have known that Price Agency had absolutely no authority to write National Fire policies. A telephone call or letter to the New Jersey Fire Rating Bureau in Newark would have disclosed that some of the insureds' property could not be physically located; that policies as represented by Martone had never been written. Green was well aware that other states in which he was doing business had fire rating bureaus, *186 but made no inquiry and did not know whether there was one in New Jersey. Had National Premium followed AFCO procedure, a simple form letter to the home office of National at Hartford asking who was authorized to sign verifications and requesting a specimen signature and where verification forms should be sent, certainly would not have been costly. A credit report on an assured with tremendous coverage, or on an agent or broker who signs requests and undertakes to be secondarily liable for substantial sums, would not be too expensive. A small statutory fee to the Secretary of State, and National Premium would have learned that the corporate assured did not exist.
This is all the more incredible when the profit on the loan, whether it be called budget charge or interest, averaged 14.78%. That margin would appear sufficiently comfortable to take one, two or more of the investigatory steps outlined above. Incomprehensible is Green's testimony that no inquiry concerning agents or assured is ever made because "we don't want to open the door to possible fraud." National Premium felt very secure in the "return premium" collateral, but their contract permitted them to proceed against the assured without resorting to the collateral and also against the agent under the warranty. Green testified that he felt safe because National Premium uses "exactly the same procedures as all other independent premium financing companies do." This statement is contradicted by one of plaintiff's exhibits. AFCO, number one in the premium financing field, enters into what are called "Insurers Agreements" with insurance companies. The "Insurers Agreements" designate for the finance company the address to which all notices or correspondence shall be mailed and names the officer of the insurance company to whom the correspondence is to be mailed, including cards of verification. Remittances by AFCO are not promised in seven to ten days (as National Premium did), but within 30 days โ time for investigation.
*187 Green further testified that he reviews each proposal for financing "to see that they are properly made out." He personally examines each verification card very carefully when it is returned. An examination of the original verification cards marked in evidence does not require an expert to see that although Martone may have been an artful swindler, he was a very poor forger. The true signature of an individual could not possibly change so many times, and in just one year. Compare the middle initial on the verification cards in transaction No. 2 and in the "Non-Signature Program" transaction dated February 1, 1961. AFCO requires a specimen signature from the insurance company. Had some record been kept of a valid signature of a person authorized by National Fire, a comparison would have immediately generated some inquiry. Had National Premium assumed any one signature of Bray to be valid, the difference between any number of the others becomes apparent.
Green testified that the only time he would communicate directly with Hartford was when there was no branch office in the state, and gave Alabama as an example. This is contraverted by the documents. In six contracts with agents and assureds in Alabama, the Hartford address was typed in by the agent and the verification card went directly to Hartford and was returned to Detroit bearing a Hartford postmark. In each instance the verification was signed by an "Underwriter" or an "Examiner." In an isolated instance, the verification was sent by National Premium to 808 Commerce Building, Montgomery (4), Alabama, and then returned to Detroit from Hartford. All forms mailed by National Premium to Philadelphia or Washington, D.C. were received in Detroit, with Hartford as the place of mailing. In no single instance in the multitude of plaintiff's exhibits of transactions originating in a variety of states, except those with Martone, did the card of verification, the last step before issuance of a check, bear the postmark of a branch office. One financing contract is from an agent in Maplewood for an assured in Hackensack. The notice *188 and verification card were sent to 1813 National Newark Building, Newark, and the verification card was returned to Detroit from Hartford with the signature of an underwriter. In the Alabama, Illinois, Indiana, Maryland, Michigan, Pennsylvania, District of Columbia and New Jersey transactions (except for Martone transactions) the verifications were signed by vice-presidents, supervisors or underwriters of National Fire and mailed from a principal and not a branch office. The cards in each of the ten transactions sued upon were signed by someone purporting to be the "Manager."
Green, although not concerned about the stability of the agent or financial responsibility of the assured, testified that National Premium did not want to be over-exposed by financing too much on the policies of one insurance company. Yet there was no system in National Premium which showed him to what extent any one assured, or any one agency or any one insurance company, was involved. In less than four years, the Martone papers to National Premium showed purported coverage risks at more than $7,000,000. A simple tabulation of Martone accounts would have disclosed this.
Nor was there any concern in the offices of National Premium when on January 8, 1963 checks totaling $9,838.39 were received from Martone in payment on other than the due date of four separate accounts. On the very next day, January 9, $6,168.75 was received by National Premium, paid with a check of Martone on other than the due date for three separate accounts. And on January 29, the following payments were made:

 Amount
 Transaction No. 7 ...................................... $ 3,743.87
 Transaction No. 7 ...................................... 3,743.87
 Transaction No. 8 ...................................... 2,491.20
 Transaction No. 4 ...................................... 2,180.48
 Transaction No. 3 ...................................... 2,075.97
 Transaction No. 5 ...................................... 1,893.30
 __________
 $16,326.69

*189 Defendants urge that the foregoing facts adequately demonstrate contributory negligence. Plaintiff, however, takes the position that since fraud and deceit are charged, contributory negligence is no defense.

I THE LIABILITY OF MARTONE
On each of the ten transactions, National Premium has sued Martone in fraud and deceit. The elements of an action in fraud and deceit are: (1) a false representation made by defendant; (2) knowledge or belief on the part of defendant that the representation is false; (3) an intention to induce plaintiff to act or to refrain from action in reliance upon the misrepresentation; (4) reliance upon the representation on the part of plaintiff in taking action or refraining from action, and (5) damage to plaintiff resulting from such reliance. Plimpton v. Friedberg, 110 N.J.L. 427 (E. & A. 1933); Williams v. DeFabio, 3 N.J. Super. 182 (App. Div. 1959); Schoharie County Coop. Dairies, Inc., v. Eisenstein, 22 N.J. Super. 503 (App. Div. 1952); Prosser, Torts (2d Ed. 1955), ง 86, p. 523; 1 Harper and James, Law of Torts ง 7.1 et seq., p. 527 et seq.
The Restatement of Torts, ง 525, defines the tort of deceit as follows:
"One who fraudulently makes a representation of fact, opinion, intention, or law for the purpose of inducing another to act or refrain from acting in reliance thereon in a business transaction is liable to the other for the harm caused to him by his justifiable reliance upon the misrepresentation."
Although it is sufficient for plaintiff to establish the elements by a preponderance or greater weight of the evidence, Fischetto Paper Mill Supply, Inc. v. Quigley Co. Inc., 3 N.J. 149 (1949); Armel v. Crewick, 71 N.J. Super. 213 (App. Div. 1961), here Martone has admitted that (a) the budget requests, the representations of the existence of the insurance, and the false verifications were made by him; (b) he knew that they were false; (c) he intended that *190 National Premium rely; (d) National Premium did in fact rely on Martone's documents, and (e) National Premium advanced monies resulting in loss to it.
The liability of Martone is clear. The amount of damages will be discussed hereinafter.

II THE LIABILITY OF NATIONAL FIRE
To assess National Fire's responsibility for Martone's fraud it is conceded that it must be through agency theories.
Plaintiff argues that Martone was a general agent for National Fire and his actions were within the unlimited broad powers of a general agent, or if Martone did not have such extensive authority, National Fire by its actions in granting a franchise to Martone placed him in a position where National Premium was justified in presuming that Martone had the authority to act as he did.
It is acknowledged that the extent of the authority of Martone and his relationship to National Fire may be expressed in an oral or written arrangement, or impliedly extended by the cloak or dress which National Fire permitted Martone to wear in public and in dealing with the public.
Martone was first licensed by the New Jersey Department of Banking and Insurance as an insurance agent in 1956. At that time he was not acting for National Fire; he did act as "insurance agent" for many other companies. N.J.S.A. 17:22-6.1 defines an insurance agent as follows:
"An insurance agent is hereby defined to be an individual, a resident of this State or whose principal office for the conduct of his insurance business is in this State, authorized in writing by any insurance company lawfully authorized to transact business in this State, to act as its agent, with authority to solicit, negotiate and effect contracts of insurance in its behalf, to collect the premiums thereon, and who has a bona fide office in this State in which is kept a record of the contracts of insurance countersigned or issued by him."
On May 6, 1957, Martone entered into an insurance agency agreement with National Fire authorizing him to receive *191 and accept proposals for insurance covering such class of risks as National Fire authorized. The proofs were clear that as limited by statute, agreement and license Martone was not permitted to write any policy but fire for National Fire. The agency agreement did not authorize Martone as an insurance agent to engage in and bind National Fire in premium financing transactions. It did not authorize him to sign Bray's name to verification cards. Therefore, to hold National Fire responsible, authority apparent or implied must be found.
Plaintiff relies on voluminous excerpts from 16 Appleman, Insurance Law and Practice, งง 8672, 8691, 8694 and 8695. Each is intended to indicate what incidents of an insurance agency render it "general," as opposed to "special" or "local."
The single most significant criterion in such a determination, as appears from those sections, is whether the agent is in fact authorized to issue policies on his own initiative. Again it should be noted that while their language supports plaintiff's view of Martone as a general agent, it relates from every indication to the agent in his dealings with insureds and proposed insureds, and the relationships obtaining between the company, agent and insured. Its applicability to collateral relationships entered into by an agent arising out of his status as such is questionable.
On the other hand, National Fire, in its argument that Martone's authority was limited and should be measured strictly by the written agreement between him and the company, contends that general agency principles do not apply to an analysis of the powers of an insurance company's agent. Bushnell v. Krafft, 133 Ind. App. 474, 183 N.E.2d 340 (Ind. App. Ct. 1962), and Insurance Inc. v. Furneaux, 62 N.M. 249, 308 P.2d 577 (N. Mex. Sup. Ct. 1957), are cited for the proposition that "the relationship of agent and insurance company cannot depend solely upon general agency principles because these relationships have their own peculiar rights and obligations." Those cases in fact followed such a rule, but they adjudicated the respective *192 rights of insurer and its agent inter sese and did not involve any question of the insurer's liability to third persons for acts of its agent performed with respect to them.
An alternative theory upon which the plaintiff urges premium financing to be among the powers enjoyed by Martone is that his implied authority encompassed that activity. The argument begins with Mechem, Law of Agency (2d ed. 1914), ง 715, p. 502:
"It is a fundamental principle in the law of agency that every delegation of authority whether `general' or `special', carries with it, unless the contrary be expressed, implied authority to do all of those acts, naturally and ordinarily done in such cases, which are reasonably necessary and proper to be done in this case in order to carry into effect the main authority conferred. This doctrine rests upon the presumed intention of the principal that the main authority shall not fail because of the lack of express authority to do the incidental acts reasonably necessary to make that authority effective, and also upon the presumption that the principal expects the business to be done in the usual and ordinary way.
The determination of this incidental authority is not a matter which lends itself readily to any hard and fast rule. It is almost wholly a question of fact. The authority here involved is not that which arises from proof of a specific usage, or the existence of any special necessity or emergency, โ * * *. The acts which are to be deemed authorized under this rule are those which are naturally and ordinarily necessary, โ which therefore are the usual incidents of the act in question โ the acts which the principal presumptively would have included without question if his attention had been called to them, โ the acts which the ordinary competent person already familiar with the situation and with the ordinary methods of business, or a similar person having the situation made clear to him, โ like a juror, โ and considering the matter in the light of every day experience, would say without serious hesitation formed a natural and ordinary part of the main act authorized.
This is the most common and most familiar principle involved in the construction of authority. The authority of an agent, for the sale and conveyance of land, to make the conveyance; of an agent, for the sale and delivery of chattels, to receive so much of the price as is to be paid at the time of delivery; of a broker, to make the necessary memorandum; of an auctioneer, to accept a bid; of the general manager of a hotel, to contract for necessary supplies โ these are but a few of the almost countless illustrations of this rule, many more of which will be found in the following chapter.
This rule ordinarily operates equally as between principal and agent and between the principal and third persons."
*193 New Jersey decisions have considered the implied power of an agent. According to Carlson v. Hannah, 6 N.J. 202 (1951), express and implied authority are different sides of the same coin. An issue in the case was whether an agent had the implied authority, under a contract granting power to act in all matters pertaining to an exclusive distributorship, to assign a portion of that distributorship. The court said:
"Attorneys in fact created by formal letters of attorney are merely agents and their authority and the manner of its exercise are governed by the principles of the law of agency. * * * The power of an agent to bind his principal is limited to such acts as are within his actual or apparent authority. * * * Such actual authority may be express or implied. Implied authority may be inferred from the nature or extent of the function to be performed, the general course of conducting the business, or from the particular circumstances of the case. Implication is but another term for meaning and intention; express authority given to an agent includes by implication, whether the agency be general or special, unless restricted to the contrary, all such powers as are proper and necessary as a means of effectuating the purposes for which the agency was created. * * * Accordingly, it is well settled that, unless otherwise agreed, the authority of an agent to manage a business extends no further than the direction of the ordinary operations of the business, including authority to make contracts which are incidental to such business, are usually made in it, or are reasonably necessary in conducting it." (at p. 212, citations omitted)
Sibley v. City Service Transit Co., 2 N.J. 458 (1949), is to the same effect.
Again beginning with Mechem (งง 716, 717), plaintiff argues that the law makes allowance for the effect of custom and usage on the range of an agent's powers. The case of Murphy v. W.H. & F.W. Cane, Inc., 82 N.J.L. 557 (E. & A. 1911), while cited for the proposition contained in Mechem, neither supports nor disproves it. Its language, while similar to that found in Mechem, is expressly restricted to cases of the class there under consideration. 82 N.J.L., at p. 563. The issue in Murphy was whether a jury could infer from the evidence that the president of defendant contracting corporation had been granted authority to award *194 subcontracts, where there was no express conferral of such authority in the by-laws or otherwise, but where it was proved that the president had previously entered into such contracts. The factor distinguishing Murphy from the instant case is, of course, the naming of defendant corporation in the former as a party to the contract, whereas National Fire was not and was not intended to be a party to the premium finance contracts.
Nevertheless, the principles enunciated by Mechem and งง 34, 35 and 36 of the Restatement of Agency, 2d are ample authority for the proposition that an agent's authority may reasonably be held to include by implication those acts proper and necessary for effectuating the purposes of the agency, or which are incidental to it, and those acts conforming to general usages in the business in which the agent is engaged.
National Fire takes the position that Martone, who represented a number of insurance companies, paid his own office rent, telephone and other expenses, and hired his own employees, was simply an independent contractor in his relationship to National Fire. Therefore, he could do naught as agent of National Fire except write the policy, collect the premium and receipt therefor.
In answer to the contention that Martone's agency was limited, or that he had the status of independent contractor, plaintiff argues that, quite to the contrary, Martone was a general agent of National Fire. Cited as authority is Volker v. Connecticut Fire Insurance Co., 22 N.J. Super. 314 (App. Div 1952), which supports the conclusion that an agent having "full power and authority to receive and accept proposals for insurance covering such classes of risks as the Company may, from time to time, authorize to be insured; to collect, receive and receipt for premiums on insurance tendered by the Agent to and accepted by the Company," is a general agent of the insurance company in question. However, it should be noted that the language in Volker was not responsive to a question whether he was a *195 general or special agent. It was in answer to the company's assertion that its agent in the particular transaction was acting as the agent for the insured and not of the company. When Martone sold and wrote National Fire policies, he acted for National Fire and was empowered to do all the usual legitimate acts necessary to effectuate his service.
It is therefore found as a fact that Martone had implied authority to assist assureds in applying for financing, but nothing produced at the trial evidences an extension of the authority so as to bind the insurance company as a party to the finance contract and responsible for the warranties of Martone to National Premium. If such implication can be found, then National Premium need only sue the principal, National Fire, on Martone's obligations to repurchase the notes. No need to discuss negligence or fraud would arise. It would be a simple contract action. But no such implied authority exists.
As between Martone and the insured, was he not acting on behalf of the insured in attempting to secure financing? By way of analogy, a property owner retains a real estate broker or agent to sell his property; the real estate broker or agent secures a purchaser who desires to consummate the sale on the vendor's terms, but cannot complete the purchase without a mortgage. If the same real estate broker or agent assists the purchaser in applying for and securing a mortgage from a financial institution, can it be argued that the real estate broker is the agent for the vendor when he arranged the financing? Is he not the agent of the purchaser, the borrower in the mortgage transaction? If we carry the analogy one step further and assume that the finance company supplies the real estate broker with forms and agrees to discount or purchase any note the real estate broker takes from any prospective purchaser, is this not a relationship created between the broker and the lender which is somewhat more than that simply of assignor-assignee of a promissory note?
*196 National Premium describes itself as nothing more than the innocent purchaser of the note from Martone. If National Premium were to have sued an assured on the note, posing as a holder in due course, and fraud had been imposed by Martone upon the assured, National Premium may not recover. Its continuing close relationship to its "producer," the printed forms all prepared by it, would permit a defense by the note maker which would bind National Premium with Martone's acts. Unico v. Owen, 50 N.J. 101 (1967).
A contract action against either an assured or the insurance company would fail.
Plaintiff, however, sues in tort and urges apparent authority running from the insurance company to Martone which sanctioned both the fictitious loan requests and the forged acknowledgement cards.
Whether the premium finance transactions of Martone were within his apparent authority is of course a fact question. C.B. Snyder Realty Co. v. National Newark and Essex Banking Co., 14 N.J. 146 (1953), contains a comprehensive statement of New Jersey law on the subject. Reaffirming and quoting from the opinion in American Well Works v. Royal Indemnity Co., 109 N.J.L. 104, 108 (E. & A. 1932), the court said:
"The rule is that the principal is bound by the acts of his agent within the apparent authority which he knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. The question in every case depending upon the apparent authority of the agent is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question; and when * * * the party, relying upon such apparent authority, presents evidence which would justify a finding in his favor, he is entitled to have the question submitted to the jury. * * *" (at p. 155)
National Premium emphasizes that its theory of the liability of National Fire is based upon the following sections of Restatement of Agency 2d:
*197 ง 261. "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."
ง 262. "A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this."
Four reported cases consider similar swindles in the field of insurance premium financing. Three of the four cite Restatement of Agency 2d, งง 261, 262, and the fourth like principles of law as set forth in 3 C.J.S. Agency, ง 255.
In Industrial Insurance Company of N.J. v. First National Bank of Miami, 57 So.2d 23 (Fla. Sup. Ct. 1952), and in Fidelity National Bank of Baton Rouge v. Central Manufacturing Mut. Ins. Co., 40 So.2d 668 (La. App. Ct. 1950), the insurance company was held to be liable to the lending institution for the fraud of its agent. In Fargo National Bank v. Agricultural Insurance Co., 184 F.2d 676 (8 Cir. 1950), and in First Trust & Deposit Co. v. Middlesex Mutual Fire Insurance Co., 259 App. Div. 80, 18 N.Y.S.2d 936 (App. Div. 1940), affirmed 284 N.Y. 747, 31 N.E.2d 510 (Ct. App. 1940), no liability was imposed upon the insurance company. With minor variations, each case involved the lending of monies by a financial institution on worthless notes of fictitious assureds, supported by fraudulent or nonexistent insurance policies.
In Industrial Insurance the tortfeasor was a "local agent" (not unlike Martone) whose dealings were constantly under the supervision of a "general agent" (working for the insurance company). The latter as an employee of the insurance company, received from the lender notice in duplicate of the financing arrangements, and returned copies to the lender with a direction to pay the local agent. It is unclear from the opinion whether the "general agent" was a party to the fraud, but in any event the Florida court found that the responses of the "general agent" directly to the *198 lender imparted an aura of validity to the "local agent's" transaction. In allowing the lender to recover, the court relied in part on งง 261 and 262 of the Restatement quoted above.
In Fidelity National Bank of Boston recovery was by the bank, but there again personnel of the insurance company with authority gave valid acknowledgements of the bank's notice of the financing arrangement, although it does not appear in the opinion how this was brought about by the tortfeasor. Among the good reasons to sustain plaintiff's position the court relied on the same sections of the Restatement. (40 So.2d, at p. 671).
No responsibility was imposed on the insurance company in Fargo National Bank where the Court of Appeals for the Eighth Circuit squarely held that the tortfeasor was not acting within the scope of actual or apparent authority. There the swindler was a state agent and the court said in dictum, "Had the sale been made in the process of helping a local agent, although in a fraudulent transaction, it might be considered within the apparent authority of the state agent." (184 F.2d, p. 682). It was further held that the evidence showed plaintiff bank to have been negligent. The court said:
"The bank relied on the premium finance contracts, and on the certificates of insurance in the purchase of the contracts, and as being genuine bona fide instruments. However, in truth and in fact, there were no bona fide insurance contracts and the premium finance contracts were forged and the name of the agent thereon fictitious.
In buying these premium finance contracts, the bank did not make any investigation. And at no time did the bank make any investigation to determine the validity of the notes or contracts; or the existence or ownership of the land described in the contracts. Neither did it ever communicate with the Agricultural Insurance Company or any agent thereof, except Ellis, in any matter connected with its purchase of these contracts. The officers of the bank, however, would question Mr. Ellis about matters connected with the premium finance contracts, and Mr. Ellis always had a satisfactory answer to all such questions. The officers of the bank relied upon Mr. Ellis, the certificates of insurance, and the provisions of the finance contracts which provided that the schedule of payments were always ahead of the *199 earned premium, so that adequate time was given for cancellation without penalty, in the event of default of payment." (at p. 678)
And:
"`If the agent steps aside from the principal's business, for however short a time, to do acts not connected with such business, the relation of agency and the agent is for that time suspended, and the agent is not acting within the scope of his employment.' 3 C.J.S. Agency ง 255." (at p. 682)
And further:
"The evidence discloses that: These transactions had been carried on for several years, and prior to 1947, without any investigation on the part of the bank as to the contracts being bona fide although it could easily have been done; the transactions were substantial in business and amount; some of the contracts were changed in minor particulars in the presence of the officers of the bank; no purported maker or soliciting agent was ever seen, contacted or investigated; no investigation was made as to security; and there was no investigation of any kind or with anyone connected with the transactions except Mr. Ellis.
No purported maker of the contracts ever appeared or responded to any notices sent out by the bank, or otherwise; no attention was given to the fact that often the paper became past due nor that the purchase price of the contracts was deposited in the account of `Dakota General Agency,' and it would appear that the bank relied entirely upon the honesty and integrity of Mr. Ellis and that confidence was badly outraged by him." (at p. 683)
In First Trust & Deposit the plaintiff bank was the assignee of the finance company. The court described the financing transaction as follows:
"The money, the return of which the plaintiff seeks, was paid by its assignor, Syracuse Investment Corporation, under the following set of circumstances:
The Investment Corporation is what is commonly known as a finance company and among its lines of business it has one of purchasing the notes of insureds given in part payment of premiums for insurance policies. Some notes are purchased from companies, some from brokers and some from agents. The business of the Investment Corporation is obtained by solicitation of the holders of the notes.
The defendant, a Massachusetts Fire Insurance Corporation, authorized to write business in this State, had from June 10, 1932, and *200 during all of the times of events on which this action is being based, properly designated the copartnership of which Keiner was a member as its agent with full authority to bind risks, to countersign and issue policies of insurance, and to collect premiums. Following the law and the requirements of the State Insurance Department, and in order to secure the consent of such department to the agency transacting business, the defendant had certified to the department the good reputation and the integrity of the copartnership. The defendant had furnished to, and left in the possession of the copartnership, policies in blank signed by the proper officers and riders and reports, with authority in all proper cases to sign and to make use of such documents." (18 N.Y.S.2d, at p. 938)
As in the present case, the lender asserted that Keiner, like Martone, acted as agent of the insurance company when he sold the notes with the certificates of authenticity, and by the insurance company's "acts and failure to act the defendant was estopped from denying the claim of plaintiff." Unlike Martone's operation, Keiner actually delivered to the lender completed policy forms, albeit fraudulent and fictitious, and a note of the fictitious insured. The other papers accompanying the transaction, the collateral certificate and the assignment of note and collateral certificate by Keiner to the finance company, were on forms almost identical with those in the ten transactions herein. This was not an isolated transaction; it was one of many. It was by mere accident that the finance company ascertained that something was wrong. The Appellate Division of the New York Supreme Court said:
"The Investment Corporation in making these loans on fictitious paper at all times dealt directly with the insurance agents and never with the insured, and never directly with the insurer company. In making the loans the Investment Corporation never made any investigation of the authenticity or validity of the policy or of the insured or of the note. It relied entirely upon the fact, which was a matter of public record, that the copartnership was an authorized agent to write business for the defendant and on the further fact that the defendant was a reputable and financially secured corporation. This confinement of its investigation as to the stability of the company and the authority of the agent is claimed by the plaintiff to have been sufficient inquiry on the part of the Investment Corporation. The information as to each policy written in the state was available *201 at underwriting bureaus, located at various points in the State, one in the City of Syracuse where the Investment Corporation had its office. There was also available to anyone desiring to purchase the service credit reports on persons seeking insurance coverage. Each time that the defendant received a policy from its agent it had the same checked by the rating bureau and secured a mercantile report on the insured. This the Investment Corporation did not do.

* * * * * * * *
The contention of the plaintiff that the defendant by its actions and omissions has placed itself (the defendant) in a position which prevents its having a valid defense to the claim of the plaintiff, is based as follows: The issuance of authority to the copartnership to write policies for the defendant, the certification of the good repute and integrity of the copartnership by the defendant, the placing into the possession of the copartnership of blank policies and other similar instruments, signed by the proper officers of the defendant, and the failure of the defendant to ascertain that Keiner was using such papers to issue fictitious policies. The Investment Corporation, in soliciting business directly from the defendant, had sent a form letter to the defendant, which form letter stated that it was doing business with the copartnership. There were discrepancies in the daily reports sent by the copartnership to the defendant and a claim is made that the defendant was careless in checking the return of the blanks to the defendant. I cannot see where any failure of the defendant to check discrepancies can be the basis of a claim by the plaintiff. The defendant did not need to anticipate the criminal acts of Keiner, because such criminal acts (the writing of the fictitious policies and the writing of fictitious notes) would not be what a principal could ordinarily anticipate from its agent. Deyo v. Hudson, 225 N.Y. 602, 122 N.E. 635; Fitch, Cornell & Co. v. Atchison, T. & S.F.R. Co., 170 App. Div. 222, 155 N.Y.S. 1079, affirmed 226 N.Y. 597, 598, 123 N.E. 864; Reimel v. Northwestern Trust Co., 298 Pa. 503, 148 A. 706; Hart v. Bier, C.C., 74 F. 592. The fact that the principal placed the signed blanks in the hands of the agent would create a liability on the part of a principal, if the placing of such blanks enabled the agent, while apparently acting within his authority, to commit a fraud upon third persons. Sections 261 and 262 of the Restatement of the Law of Agency. The plaintiff herein may not invoke the protection of the rules as stated in Sections 261 and 262, because information as to the dubious acts of Keiner was as available to the Investment Corporation as it was to the defendant, and even more so because the Investment Corporation was dealing directly with Keiner in these transactions and the defendant had no knowledge of these transactions. If the theory of estoppel were to be invoked, it should be invoked against the plaintiff's assignor, because the use of the slightest of reasonable precautions by such assignor would have saved the damage and loss complained of in this action. Bay Parkway Nat. Bank v. Shalom, 270 N.Y. 172, 200 N.E. 685.
Most important of all in deciding the merits of the alleged causes of action is the conclusion that must be reached by an examination *202 of the note and certificate above set forth. That note and such certificate were given in a transaction on behalf of the copartnership as an entity, or on behalf of ostensibly insured, or on behalf of the Investment Corporation, and not in behalf of the copartnership as agent for the defendant.
In this transaction, neither Keiner nor the copartnership acted on behalf of the defendant, and neither Keiner nor the copartnership acted under an apparent authority given by the defendant. There was no liability on the defendant herein to the assignor and, therefore, there is no liability on the defendant to the plaintiff herein." (18 N.Y.S.2d, at p. 941)
The judgment was affirmed by the Court of Appeals, First Trust & Deposit Co. v. Middlesex Mutual Fire Ins. Co., 284 N.Y. 747, 31 N.E.2d 510 in a terse per curiam opinion:
"Judgment affirmed with costs on general ground that the fraud of the defendant's agent was not perpetrated in the course of the agent's employment."
We have not been referred to, nor do we find, any case which expressly incorporates both งง 261 and 262 of the Restatement into the law of New Jersey. However, a number of discussions, taken into consideration collectively, gives rise to the general acceptance by our courts of the premises of the two cited sections.
In Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329 (1961), the question whether an agent's acts were attributable to his principal was squarely presented. Said the court:
"The general rule is that a principal is accountable for the conduct of his agent acting within the scope of his authority even though the conduct is unauthorized and the principal receives no benefit from it * * * The reason for the rule is that though the agent may have deceived the principal as well as the victim, since the principal placed the agent in the position where he had the power to perpetuate the wrong, the principal rather than the innocent third party should bear the loss." (at p. 338)
In Gardner v. Rosecliff Realty Co., 41 N.J. Super 1 (App. Div. 1956), a corporation and its president were sued *203 for breach of contract and deceit. At the trial's end, only the claim in deceit against the corporate defendant remained. Upon the rendering of a verdict and judgment for the plaintiff, defendant appealed on the basis that the misrepresentation sued upon was not made by its president within the scope of his apparent authority. The court understood
"* * * the law now to be * * * a principal may be held, in an action of deceit for damages resulting from his agent's fraudulent representation, where the principal has put the agent in such a position that a person of ordinary prudence, conversant with business uses, would be justified in presuming that the agent has the authority to make the representation. Restatement of Agency, งง 257, 261; Seavey, Studies in Agency 261, 262, 273-279 (1949)." (at p. 9)
A strict reading of the Gardner case requires the indication here that the above quoted statement, while definite and unequivocal, is dictum, since the question of the scope of authority of defendant's president was not put in issue in the trial court and therefore was not decided in the Appellate Division.
Also cited for the proposition that New Jersey law is summarized by งง 261 and 262 is Mesce v. Automobile Association of New Jersey, 8 N.J. Super. 130 (App. Div. 1950). The court said:
"It is, of course, the general rule that the principal is bound by the acts of the agent within the apparent authority which he knowingly permits the agent to assume or which he holds the agent out to the public as possessing. The factual question is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business uses, and the nature of the particular business, is justified in presuming that such agent has the authority to perform the particular act in question * * * When established, the authority, implied or apparent, can neither be qualified by the secret instructions of the principal nor enlarged by the unauthorized misrepresentations of the agent." (at p. 135)
The question then, in the language of Ross Systems, supra, is whether Martone acted within the scope of his *204 authority when he engaged in premium financing transactions, and therefore whether his fraud in connection with those transactions is attributable to National Fire.
National Fire argues that an action for fraud is an action in tort. It then allows that apparent authority is unavailable in a tort action as a means to the imposition of liability, relying upon Rothenberg & Son, Inc. v. Nako, 49 N.J. Super. 372, 380 (App. Div. 1958), where the court said, "The general rule is that there can be no tort liability predicated upon apparent authority because of lack of the essential element of reliance." The tort in Rothenberg was negligence, and it must have been negligence that the Appellate Division had in mind when it used the word "tort." This is so because the Court expressly relied upon "Restatement, Agency," ง 265, p. 587, which provides:

"ง 265. General Rule
(1) A master or other principal is subject to liability for torts which result from reliance upon, or belief in, statements or other conduct within an agent's apparent authority.
(2) Unless there has been reliance, the principal is not liable in tort for conduct of a servant or other agent merely because it is within his apparent authority or apparent scope of employment.

* * * * * * * *
The person harmed may be the one to whom the manifestation is made, as where an action of deceit is based upon misrepresentations which are apparently authorized, or where an action for physical harm is brought based upon an untrue representation of safety."
The meaning and the extent of "reliance" come into issue when plaintiff carries the burden of proof in the fraud action and defendant the burden of proving the defense of contributory negligence to the negligence count.
Plaintiff argues that contributory negligence or estoppel to deny agency is no defense to an action in fraud and deceit. National Fire (and Rothberg) responds by agreeing that this is a correct principle of law as against the active wrongdoer, Martone, but contends that as against an innocent principal (one guilty of no active wrongdoing) the defenses are available.
*205 The defense of "contributory negligence", or "estoppel," is an affirmative one, and the burden is on him who advances it. "Justifiable reliance" or "reasonable reliance" as an essential element of fraud places the burden on plaintiff. But by whatever label these theories are called, the governing principles overlap in this case, for if contributory negligence is proved, there could not have been justifiable reliance.
In Mesce v. Automobile Association of New Jersey, supra the court said:
"While one who is sued for fraud cannot successfully plead that if the plaintiff had exercised reasonable care, he would not have been defrauded, yet where no active wrongdoing is attributed to the principal and the action is constructed upon the fraud of an agent who was not instructed or actually or impliedly authorized to commit it, there can be no recovery by a plaintiff who could have readily protected himself by opening his eyes and at once observing on the face of the paper which he signed the falsity of the agent's representation. This plaintiff was stricken by insouciance. Many centuries ago a Greek philosopher stepped into a well while looking at the stars, from which experience came the maxim: `He who looks foresees the peril that the heedless encounters.'" (8 N.J. Super., at p. 136)
The language, but not the facts, of Crescent Ring Co. v. Travelers Indemnity Co., 102 N.J.L. 85 (E. & A. 1926), is broader and can bear an interpretation which would impose a general standard of care upon one so defrauded. The court there said:
"While one sued for fraud cannot set up as a defense that, if the plaintiff had exercised reasonable care, he would not have been defrauded; yet, where no active wrongdoing is attributed to the principal defendant, and reliance is placed upon the fraud of an agent, who was not instructed, or actually or impliedly authorized, to commit it, there can be no recovery by a plaintiff who could have protected himself by examining into the character of the transaction and the truthfulness of the representations made, unless the defendant, with knowledge, ratifies it". (at p. 93; emphasis supplied)
National Premium argues that the rule established by Mesce and Crescent Ring applies only to cases involving a *206 failure to read an insurance policy. It further contends that even if the rule were to be extended to include broader factual situations, it has been (to use plaintiff's words) "watered down considerably" in Heake v. Atlantic Casualty Ins. Co., 29 N.J. Super. 242 (App. Div. 1954), affirmed 15 N.J. 475 (1954). In Heake the insurance agent misrepresented and acted improperly. It was argued by defendant that plaintiff's negligence in failing to read the policy and observing the conditions estopped him from obtaining relief. It is interesting to note that the Appellate Division said:
"None of our cases of the Crescent Ring Co. type discusses whether the rule imposing the duty to read the policy should be applied strictly or with some tolerance toward the holder. While recognizing the binding force of the rule on this court, it seems to us that in applying it we should give due regard to the facts and circumstances of the particular case and to the equality or inequality of knowledge or opportunity for knowledge of the insurer and insured." (at p. 258)
The Supreme Court in affirming, said:
"The defendants, however, claim first that the agent's conduct is not imputable to them, citing cases that hold that the principal is not liable for an agent's fraud where no active wrongdoing is attributable to the principal. But the rule is otherwise; as stated in American Surety Co. v. Conway, 88 N.J. Eq. 370, 375 (E. & A. 1917):
`Knowledge of the agent is chargeable upon his principal, whenever the principal, if acting for himself, would have received notice of the matters known to the agent.'
Here the honest mistake of the insured was caused by the reprehensible conduct of the defendant's representative. In the eyes of the law Atlantic knew Gargano's age and his lack of driving experience, because Gargano gave Preiksat documentary evidence thereof. The fact that the principal has not authorized or approved the fraudulent conduct of its agent โ in obtaining business by falsely recording the documentary evidence from the insured โ in no way relieves it of responsibility for his actions. Since it has placed the agent in a position to do such acts it must be answerable for the manner in which the agent has conducted himself in doing business on behalf of the principal." (at p. 482)
In connection with the defense in that case, that if the insured had read the policy he would have discovered that he was excluded from coverage, the Supreme Court said:
*207 "* * * Yet it is also quite clear that where the insurer has been guilty of fraud or other unconscionable conduct, it cannot successfully plead that if the insured had exercised reasonable care he would not have been defrauded. * * *" (at p. 483)
Perhaps Heake does qualify the rule in Mesce and Crescent to the effect that each case should be decided on its own facts and under some circumstances the rule should be applied with "tolerance," but it is not an implied overruling of those cases. This is true despite the fact that the conduct of the agent may have been fraudulent and the company did not engage in "active wrongdoing." The Supreme Court in Heake has implicitly imputed the agent's conduct to the company and then found that such conduct avoided the requirement that the insured exercise due care. Nevertheless, we cannot accept plaintiff's contention that this holding by the court overruled Crescent and Mesce, for Heake is confined strictly to the facts of that particular case. This last assertion is based on the following language of the opinion:
"The result might be different if the agent had not been shown documentary proof of the insured's truthful representations, or if he had not induced the insured to rely on him by signing the application in blank as if it were the normal course of business or if the application had been attached to the policy where such documents frequently are to be found with the other typewritten material or if the policy had been in the usual form of combination automobile policy. But, as we have seen, the policy was unusual, if not unique, in this state in the size of the individual pages, the number of the pages, the size of its print, the location of the endorsements at a spot remote from the other typewriting on the policy. In addition, a reading of the two endorsements discloses a patent ambiguity which must be resolved against the company. The one endorsement excludes from its coverage those drivers who have been licensed to operate an automobile less than one year, thus apparently omitting from the coverage Gargano who, to the imputed knowledge of the insurer, fell in this excluded category. On the other hand, the second endorsement specifically includes Gargano "age 23" within its terms.
In these circumstances we agree with the courts below that the plaintiffs have produced the clear and convincing proof on which alone the extraordinary remedy of reformation will be granted." (at p. 484)
*208 Thus, at this juncture the law in New Jersey is generally that one who sues an insurance company in fraud and deceit for the acts of its agent, and who could have protected himself by an examination of the policy, is under an obligation to do so. This rule is subject to the exception carved out by Heake to the effect that such a duty is lifted from a defrauded insured when all the circumstances combine to render inequitable its imposition.
Our courts have many times in contracts of adhesion leaned heavily in favor of the insured as against the insurance company.
It would seem that if the obligation to open one's eyes (as in Mesce), or examine into the truthfulness of a representation, is imposed on an insured vis-a-vis an insurance company, a finance company, alert to business impositions and frauds of all kinds, should have a similar or greater obligation than the unlearned assured. A finance company should not be permitted to stand on the same protected plateau as the unwary, the foolish or the untutored consumer.
Plaintiff relies extensively on Bowman v. Home Life Ins. Co. of America, 260 F.2d. 521 (3 Cir. 1958). There an underwriter of defendant insurance company, armed with an introductory inquiring postcard and a black doctor's bag and posing as an insurance company doctor disported himself with two female applicants for insurance. At the trial level the company was held not responsible on the imputation of its agent's conduct. It should be noted that the active wrongdoer was an employee of defendant. In reversing, the Court of Appeals for the Third Circuit said:
"Although language in some Pennsylvania cases would seem to suggest that the test is as prescribed by the trial court below, we think that they cannot properly be regarded as going that far. All the cases which have been brought to our attention involve situations in which the party dealing with the agent should have been on notice that the agent's authority was other than as represented by the agent. Of course, once a party should be on notice; i.e., once his reliance is unreasonable, he acts at his own risk in determining the *209 existence or scope of the agent's authority." (at p. 523; emphasis supplied)
Thus, Bowman suggests the existence of a requirement that a party's reliance on a fraudulent representation be reasonable.
Bowman relied heavily on Restatement, Torts, ง 540, as does the plaintiff here. It is true that that section holds the reliance of a victim in a business transaction is justified despite his failure to make an investigation which would have uncovered the fraud. The rule is the same according to the comment, even if the investigation would be de minimis. However, reading ง 540 without attending to the other relevant provisions results in an incomplete picture of the law. This section appears in a division of the Restatement entitled "Deceit: Business Transactions." The fundamental provision is ง 525:

"ง 525, Liability for Fraudulent Misrepresentations.
One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable to the other for the harm caused to him by his justifiable reliance upon the misrepresentation." (emphasis supplied)
Attention is called to the use of "justifiable reliance." The necessity of this element in any cause of action is emphasized by ง 537:

"ง 537 General Rule
The recipient of a fraudulent misrepresentation in a business transaction can recover against its maker for harm caused by his reliance upon it if, but only if, his reliance is justifiable." (emphasis supplied)
It is in response to this provision that ง 540, quoted by plaintiff, discusses the absence of the necessity to investigate. But ง 541 has a moderating effect on ง 540: "The recipient in a business transaction of a fraudulent misrepresentation is not justified in relying upon its truth if its falsity is obvious." Comment (a) to ง 540, partially quoted in plaintiff's *210 original brief, continues: "On the other hand, if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious under the rule stated in ง 541." Comment (a) to ง 541 is relevant to what might have been observed by National Premium from the face of the budget contracts:
"While the recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity had he shown his distrust of the maker's honesty by investigating its truth, he is nonetheless required to use his senses and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory inspection of the article. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only where the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus, a defect which any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses." (emphasis supplied)
Would an experienced finance company executive or banker note the many inconsistencies and obvious falsities on the face of the finance requests? Would he see that important blanks on his own form had not been filled in (such as corporate authority)? Are not the great variety of signatures of Bray, some arriving in Detroit and inspected by Green on the very same day, indicative of the defect?
Prosser on Torts (2d ed. 1955) in ง 89, goes further than Mesce, supra. Dean Prosser describes Green when he speaks of one who is so skeptical that he reposes no confidence in the first representation and makes a subsequent verification. To paraphrase, if after receiving Martone's requests, Green is concerned about fraud and seeks to verify Martone's representation, it cannot be said that he relied on that initial representation if he acts on the information (the acknowledgement card) subsequently obtained. The fact that National Premium was unwilling to accept Martone's statements *211 without verification is evidence that National Premium did not believe it.
Prosser continues to describe "justifiable reliance" in ง 89:
"Not only must there be reliance, but the reliance must be found to be justifiable under the circumstances. The plaintiff's conduct must not be so entirely unreasonable, in the light of the information open to him, that the law may properly say that his loss is his own responsibility. In some cases, of course, the unreasonableness of his conduct has been regarded as sufficient evidence that he did not in fact rely upon the representation โ he may testify to his reliance, but the court or the jury is not compelled to believe him. But in many cases where the plaintiff's reliance and good faith are unquestioned, it may still be held that his conduct was so foolish as to bar his recovery. He may not put faith in representations which are preposterous, or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth, and still compel the defendant to be responsible for his loss."
It must follow, also, that one such as Green, who has special knowledge and experience, may not be permitted to rely on circumstances under which the average layman might recover.
But Green says that even if discrepancies existed and might have been noticed in the loan applications, it was the carelessness of National Fire in allowing the theft of the mail which caused the damage.
Time and again in the course of both direct examination and cross examination Green asserted that he relied on the verification acknowledgement card and not on the budget request, or the signature or credit of the assured. Nor did he rely on the stability of the agent, Martone. Unhesitatingly, he acknowledged the possibility of collusion and fraud between an assured and the agent as against the finance company.
Therefore, what act of Martone did he rely upon? Not the forwarding of the budget request and application for the loan. If it were the forged cards, then how can plaintiff rely on implied or apparent authority? Plaintiff cannot *212 argue that it knew Martone had signed the cards and that he had apparent or implied authority to do so, for then the forgery is apparent. Therefore, he did not rely on an act of Martone but on the act of William A. Bray, who by his signature purported to bind defendant National Fire.
Similarly, in the "Price Agency" transactions, Green did not rely on the apparent authority of Martone as a partner of Rothberg, for of this relationship he was not aware. Green only learned of the existence of a so-called Price Agency after the entire fraudulent scheme had been uncovered. Here again, in the Price Agency transactions he relies on a verification card purported to have been signed by Bray. (Bray had left National Fire's New Jersey office almost ten months before the "Price Agency" transactions.)
Although it was within the implied authority, as extended from the express authority granted by National Fire, for Martone to engage in assisting an assured in securing premium financing, nothing supports the extension of that authority to the theft of mail addressed to National Fire and the forgery of the name of Bray, equally unauthorized to make a verification binding on National Fire.
Martone admittedly performed a series of criminal acts in supplying the fictitious paper in the first instance, and his last criminal act in each transaction was the interception of the mail and the forgery.
Plaintiff seeks to impose liability based upon an affirmative duty owed to National Premium by National Fire of due care with regard to the incoming mail.
All the cases relied upon by plaintiff are personal injury negligence actions, the most recent pronouncement being Goldberg v. Housing Authority of City of Newark, 38 N.J. 578 (1962), where the court said:
"Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." (at p. 583)
*213 This quotation may be considered helpful on both the fraud and negligence charge against National Fire. There was no proof whatsoever that National Fire could have possibly anticipated Martone's criminal act in the mail interception and forgery. National Premium was aware of the risks of doing business the way it did. Green was concerned with the fraud and collusion of agent and insured. Green was aware of the prior incidents of fraud in premium financing, not only in reported court decisions but from seminars conducted at conventions of finance companies.
Those engaged in the financing of insurance premiums were advised as far back as 1952 to "Know your agent and insured, as well as the company writing the policy"; "Examine carefully all policies of an unusual nature"; "Observe all default conditions constantly and act immediately when any default arises"; "Be certain that note and assignment are properly executed by authorized signatories." See Woodland, Insurance Premium Financing and a National Experience Survey (June 1952) (American Bankers Association Library, 443 C. 2). The same thesis, (at p. 52) describes the procedure to determine proper execution.
"Signatures for a corporate insured present a different problem since the signing authorities of a corporation cannot be known to the bank unless it also happens to be the depository for the corporate business. In the absence of proper documentation in its files, the bank may arrive at the authenticity of the signatures in one of two ways: require that the corporation file with it a certified resolution authorizing certain officers to execute the finance agreement, or include in the agreement itself a statement to the effect that the corporate signers warrant that they have the authority and power to execute the instrument. It is the practice in many instances to have the corporate seal affixed at the bottom of the agreement at the time of execution."
National Premium was not obligated to make any loan to Martone's assured and if it did engage in a known risky business, it must have assumed an obligation to take all reasonable steps to eliminate the possible criminal impositions.
*214 Was there a duty running from National Fire to National Premium to absolutely insure against the criminal activities of Martone? If any such duty existed, it would be against the standard as set forth in Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29 (1958), as paraphrased to fit this case: If National Fire is placed by circumstances in a position with regard to National Premium so that everyone of ordinary sense who did think would at once recognize that if National Fire did not use ordinary care and skill in its own conduct with regard to the attendant circumstances, it would cause damage to National Premium, a duty arises to use ordinary care and skill to avoid such danger.
Assuming that a duty owing from National Fire to National Premium exists was that duty breached? Whether such a breach occurred is a question for the finder of fact. See, for example, McKinley v. Slenderella Systems of Camden, N.J., Inc., 63 N.J. Super. 571 (App. Div. 1960):
"Duty signifies conformance to a reasonable standard of legal conduct in light of the apparent risk. The existence of a duty is a question of law; failure in that duty must be proved as a fact." (at p. 581)
The plaintiff asserts a variety of theories underlying its allegations of negligence. Those relating to the claimed misfeasance and nonfeasance of Bray and Bross raise only the factual issue whether these individuals breached a duty. The class of theories relating to the negligence of the Misses Schurr and West raise, in addition, the legal question whether their negligence, assuming there was such, is imputable to National Fire.
Imputability of a servant's acts to his master is in fact governed by the determination whether those acts were committed within the scope of his authority, McAndrew v. Mularchuk, 33 N.J. 172 (1960), unless plaintiff can show reliance upon apparent authority. J.L. Querner Truck Lines, Inc., v. Safeway Truck Lines, Inc., 65 N.J. Super. 554 (App. Div. 1961) affirmed 35 N.J. 564 (1961). The *215 total absence of contacts or a relationship between Misses Schurr and West and National Premium removes the question of apparent authority.
It is settled in our State that a master will be liable if the act of the servant resulting in the injury was within the scope of the servant's employment, notwithstanding that the act was in violation of the master's instruction as to the method of performing the work or was expressly forbidden. Wright v. Globe Porcelain Co., 72 N.J. Super. 414, 418 (App. Div. 1962), where the court went on to say that the scope of the implied authority was for the factfinder.
If we were to assume the duty and a breach, the next question ordinarily would be whether the breach proximately caused the damage. Here, then, consideration must be given as to whether Martone's acts of mail interception and forgery constituted the efficient intervening cause, or superseding cause, of National Premium's loss. But the question is not one of causation at all, but rather another aspect of the duty problem, i.e., what obligations are imposed by the foreseeable consequence of Martone's acts. Avedisian v. Admiral Realty Corp., 63 N.J. Super. 129 (App. Div. 1960); Seipel v. Sevek, 53 N.J. Super. 151 (App. Div. 1958) reversed on other grounds 29 N.J. 593 (1959). In these cases the asserted intervening causes were noncriminal. Foreseeability may be based upon the knowledge of similar prior occurrences. Harpell v. Public Service Coordinated Transport, 20 N.J. 309 (1956).
But it still remains for a jury, or the court as factfinder where a jury trial is waived, to determine whether the act complained of was a normal incident of the risk created or an event which could reasonably have been foreseen and consequently no effective breach in the chain of causation. Rappaport v. Nichols, 31 N.J. 188, 204 (1959).
The law prevailing in New Jersey with regard to intervening cause is essentially that expressed in the rules of the Restatement, Torts, 2d. Sections 440 and 441 respectively *216 define superseding and intervening cause. The intervention of the former relieves a negligent actor of liability, while the operation of the latter may or may not have such effect, this being determined by งง 442 through 453. Most relevant, however, for present purposes are งง 448 and 449. The former provides that one whose negligent conduct created a situation which afforded a third person an opportunity to commit a crime is not liable to another injured thereby "unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." The much discussed case of Brower v. N.Y. Central & Hudson River R.R. Co., 91 N.J.L. 190 (E. & A. 1918), involved criminal acts intervening between the negligence and loss. The facts in Brower compromise the illustration under ง 448 of the Restatement.
A good general view of the problem is found in Eldredge, "Culpable Intervention as Superseding Cause," 86 U. of Pa. L. Rev. 121 (1937). The author indicates that "proximate cause" has two meanings, the first involving primarily the question of causation in fact, with the consequent application of physics to its solution. His discussion of the second meaning begins at page 122:
"The second problem which must be dealt with in determining whether the defendant's conduct is the legal cause of the plaintiff's harm is entirely different. It does not relate to the findings of the physical facts and their causal interrelation at all. It involves the quite separate and far more delicate question of how far society should go in requiring the defendant to pay for damages which his conduct has in fact been a substantial factor in producing."
Professor Eldredge is of the opinion that a proper determination of the case will be reached by asking first whether the trier of the fact can reasonably find that defendant's conduct was a substantial factor in producing the harm. If the answer is no, that ends plaintiff's case. If the answer *217 is yes, the second and more difficult question is: Is there any sound social reason why the plaintiff should not succeed?
Courts have been troubled throughout the years in numerous court decisions with the extent to which an intervening force constitutes a superseding cause, and this is especially true where it consists of intervening human action. At page 125 Eldredge continues:
"Suffice it to say that the decided modern trend of authority, both in England and America, has been to make the liability of the defendant turn upon whether the intervening human action was foreseeable and to hold defendant liable where in the retrospect the intervening act did not appear to be particularly unusual or extraordinary. The imposing list of writers who have studied the problem have uniformly urged that the defendant be held liable for harm caused by foreseeable human intervention, regardless of whether it be innocent, negligent, or even criminal."
Quoting from Bohlen, Studies in the Law of Torts, 504-5 (1926), the author continues (at p. 125):
"The decided though perhaps not unanimous tendency of modern authority is to make the liability of the original actor depend not upon the negligence or even intentional wrongfulness of the subsequent act of a third party, which is the final decisive cause of the plaintiff's harm, and so upon the legal culpability of such act, but rather upon this, โ whether or not, in view of the surrounding circumstances, and the conditions which the defendant's conduct may be expected to create, the third party's subsequent action was normal, and so expectable * * * There is normally no reason to anticipate wilfull wrongdoing of others, but this bears only on the question as to whether the act is expectable or not. In exceptional situations even wilfully wrongful acts of others are normal and expectable."
Feezer and Favour in their article, "Intervening Crime and Liability for Negligence," 24 Minn. L. Rev. 635 (1940), are more to the point. At page 637 they state the subject of their paper:
"In general I [Feezer was only assisted by Favour] shall endeavor to stick pretty close to the particular problem presented to the court in the Brower Case [discussed supra]. It seems to me that problem is this: Shall one who by his negligence has set a stage upon which *218 a third person commits a crime be responsible to the person suffering loss or injury from the crime?"
Feezer poses the following questions at (p. 643):
"When will the law require the negligent actor to foresee the possibility of crime? Where does duty come in here? The foreseeability of harm being the recognized test of negligence, it may well be that in some cases the recognition that the conduct of the defendant in creating a situation where, as a reasonable man, he should foresee the possibility and/or probability of such opportunity being taken advantage of for the commission of a crime, foreseeability may become the basis of liability irrespective of any question of legal or proximate cause."
At page 648 the authors summarize the discussion up to that point:
"But in connection with intentional intervening acts of third persons, most courts profess to limit the original wrongdoer's responsibility to cases where such intervention was expectable and some are even more strict on the theory that crime is never expectable.
It cannot fairly be said as a matter of law, and should not be categorically laid down, that crime is entirely unexpectable in any situation where the stage set by the original wrongdoer's negligence affords an opportunity for crime to any person with criminal impulse who may happen to appear on the scene.
On the other hand, the probabilities of crime intervening in every case of negligence are not so great that the negligent man should invariably be burdened with this risk."
In addition to the question whether a defendant's conduct was a substantial factor in causing plaintiff's harm by creating an opportunity for intervening crime, the authors consider "essential" the following question in a charge to a jury: "Was the foreseeability or expectability of such crime as was committed sufficiently real so that the defendant should be burdened with the risk?" (at page 649).
In Harper and Kime, "The Duty to Control the Conduct of Another," 43 Yale L.J. 886 (1934), a somewhat different tack is taken. Analysis is there restricted largely to the relationship between plaintiff and defendant, or between *219 defendant and some third person. Most relevant for present purposes is the language appearing at pages 895 and 896:
"There are other situations where there is involved the principle that a special relationship between the two persons which gives the one a definite control over the actions of the other carries with it the duty to exercise that control in such a way as to protect third persons * * *
The relationship of master and servant, it seems, affords the master in some instance a peculiar ability to control the conduct of the servant even beyond the ambit of activity commonly designated as the scope of the employment. Some acts are so clearly disconnected with the purpose of the employment and so exclusively done by the servant on his own account that they are clearly not of a character such as to make the master liable under the doctrine of respondeat superior. Nevertheless, these acts may be so connected with the employment in time and place as to give the master a special opportunity to control the servant's conduct. In an interesting case decided by the United States Supreme Court (Fletcher v. Baltimore and Potomac R.R. Co., 168 U.S. 135, 18 S.Ct. 35, 42 L.Ed. 411 (1897) a defendant railroad company was held liable when a piece of timber thrown by a member of a crew of a passing train struck the plaintiff and caused serious injury. It appeared that the train crews frequently engaged in such conduct to the knowledge of the company and that, although they so acted entirely outside the scope of their employment, the company owed the duty to individuals to correct such dangerous conduct."
In accord with the articles already discussed is Bohlen, "Fifty Years of Torts," 50 Harv. L. Rev. 1225 (1937). The author states that "The test has come to be whether the later act, which realized the harmful potentialities of the situation created by the defendant, was itself foreseeable." (at p. 1229) Language appearing at page 1231 of the article is highly relevant to the immediate issue:
"In one particular the later cases show a vital change. No longer is an intervening act necessarily a break in the chain of causation because it is not merely wrongful, but done for the purpose of causing the very harm which it inflicts. The idea that every man is a free agent, that he and only he is responsible for all his acts, is gradually giving way to a recognition that the conduct of human beings is too often conditioned by the environment in which they are placed. The natural tendency of courts, who after all are human beings, to hold an over flattering opinion of human nature has led *220 them to regard it as more probable that some hero will risk his life to save a child imperiled by the defendant's negligence than that some less worthy person will avail himself of a tempting opportunity afforded by the defendant to commit a criminal offense. Nonetheless where there is a peculiar danger of such misconduct, courts have not hesitated to allow recovery though all that the defendant did was to afford an opportunity and perhaps a temptation for its commission."
National Fire argues that its employees could not reasonably have been expected to anticipate Martone's forgery, and relies upon Moss v. John A. McCrane Motors, Inc., 9 N.J. 309 (1952). There plaintiff purchased a car from McCrane Motors through its agent Hackett. The purchase price was delivered to Hackett, who deposited the sum in Mrs. Hackett's account and then transmitted her check to McCrane. The latter then turned over the manufacturer's statement of origin to Hackett, this instrument bearing an assignment to Moss. Instead of delivering the certificate of ownership to Moss, along with the car, he retained it and forged plaintiff's name to the blank assignment usual in such certificate. After filling in his name as assignee, he obtained a new ownership certificate in his own name. Hackett was thereby enabled to execute a chattel mortgage to the First National Bank in Garfield as security for a loan.
Because she was unable to obtain a clear document of title, Moss sued McCrane for rescission, offering to return the car. This relief was granted. The real contest in the case was between McCrane and the bank. The Chancery Division denied McCrane's plea that the chattel mortgage be cancelled "on the ground that McCrane's action `in delivering to Hackett the Moss certificate of ownership' made possible the fraud upon the bank, and that as between two innocent parties `the loss must fall upon the one who made that loss possible.'" 9 N.J., at p. 313.
On appeal the Supreme Court reversed. It said:
"Ordinarily a bank which advances funds in reliance on a forged instrument must bear the loss; this rule is applicable whether the *221 instrument be a promissory note or bill of exchange or a document of title of lesser negotiability. * * * It is clear that particular circumstances may give rise to an estoppel against the person seeking to assert the forgery in which event the bank will be protected * * * But it is equally clear that the mere act of entrusting an agent with possession, for proper delivery, of an instrument duly bearing the name of the payee or transferee will not create an estoppel where the agent forges the name of the payee or transferee and turns over the instrument to an innocent purchaser." (at p. 313)
And:
"The criminal act of forgery is generally not to be anticipated * * * and the delivery of a properly completed instrument, not endorsed in blank, to a trusted employee for delivery to the named payee or transferee appears to bespeak care rather than negligence." (at p. 314)
Most relevant, however, for present purposes is the court's holding that even if there were negligence, the proximate cause of the bank's loss was Hackett's forgery:
"Applying the foregoing principles it is evident that in the instant matter McCrane's act in delivering the manufacturer's statement of origin duly endorsed to Moss was in nowise negligent and furnished no basis for an estoppel. It was not this act but Hackett's subsequent forgery and misappropriation of the certificate of ownership issued to Moss and the absence of any examination of the car or any inquiries of McCrane or Moss by the bank which proximately resulted in the bank's grant of the loan." (at p. 314)
The bank argued that McCrane was negligent in accepting Mrs. Hackett's check, and after reviewing the circumstances surrounding this event, the court was unable to find that Mrs. Weigele, defendant's office manager, was negligent in accepting Hackett's explanation of his reasons for delivering his wife's check. The court then said:
"But whether or not it was an adequate explanation, the check furnished no reason for Mrs. Weigele to suspect that there was any likelihood of the forgery and misappropriation of the certificate of ownership and was not proximately related to the bank's loan." (at p. 315)
*222 In Saracco v. Lyttle, 11 N.J. Super. 254 (App. Div. 1951), the court held that it was not reasonably to be anticipated that an intermeddler would not only drive an unlocked car away but also would later negligently operate it. The leaving of the automobile unlocked afforded an opportunity for the unlawful taking, but this was merely a circumstance and not the proximate cause of the collision.
The following language in Caputzal v. The Lindsay Co., 48 N.J. 69 (1966), is helpful:
"Recovery for the type of result here involved is denied in many cases also on the ground of lack of proximate cause, which we should briefly mention. Utilization of that term to draw judicial lines beyond which liability will not be extended is fundamentally as an instrument of fairness and policy, although the conclusion is frequently expressed in the confusing language of causation, `foreseeability' and `natural and probable consequences.' Many years ago a case in this State hit it on the head when it was said that the determination of proximate cause by a court is to be based `upon mixed considerations of logic, common sense, justice, policy, and precedent.'" (at p. 77)
The Caputzal case leads to the defendant's view of causation of the harm to plaintiff occasioned by Martone's acts. It is expressed in ง 435 of the Restatement Torts 2d:

"ง 435 Foreseeability of Harm or Manner of Its Occurrence
(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.
(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm."
Plaintiff suggests the applicability of ง 449 of the same Restatement. The peculiar fact in the instant case which renders it so different from all the cited intervening cause cases is that the claimed intervening act, namely Martone's forgery and fraud, was conduct extremely similar to that which plaintiff sought to guard against by use of the acknowledgement *223 cards. Section 449 seems directly applicable to such a situation.

"ง 449 Tortious or Criminal Acts the Probability of Which Makes Actor's Conduct Negligent.
If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."
What has here been said about foreseeability applies with equal force not only to the charge of negligence against National Fire but also whether National Premium has been guilty of contributory negligence. Additionally, it bears directly on whether National Premium has carried the burden of establishing by a preponderance of the evidence the fifth required element for successfully establishing a charge of fraud, namely, "justifiable reliance" or "reasonable reliance."
It is readily apparent that National Premium was a financer who supplied all of the forms of notes and budget requests. It encouraged Martone to use its financing over that of other companies. It schooled, counselled and aided Martone in not one isolated transaction, but a series running over a four-year period. It was in the true sense of the word an active participant in the initial transactions between Martone and the assured.
There is no jural phrase to describe precisely the continuing relationship between Martone and National Premium. In the recent decision of the Supreme Court in Unico v. Owen, supra, Justice Francis deprives the financer of a holder in due course status because of its peculiar relationship to the seller (here Martone). Should not the protection given to the consumer there be extended to include the innocent third party? Over Martone's objection, and on a silver platter, National Premium offered to Martone the opportunity to commit his criminal acts. When Martone insisted that the acknowledgement verification cards go *224 to Hartford (where mail interception would have been impossible) Green simply deleted the Hartford address and inserted the address of the small Newark office.
Martone's intervening criminal acts of forgery superseded all else in the case. Here the substantial factor in producing the opportunity of the criminal act was the procedure of National Premium and not of National Fire or its authorized employees. Even were this not so, apparently, under all the circumstances and a balancing of the equities it would be grossly unjust to impose a loss upon National Fire which National Premium contributed to in its competitive efforts against other finance companies in the commercial desire to become number one in the field.
During the course of the trial it was suggested that if equitable principles were to be applied by the court, perhaps both National Fire and National Premium should share the loss.
Professor Warren Seavey suggests that where there is a fraud performed by a dual agent the comparative negligence theory of admiralty law would be most appropriate. "Embezzlement by Agent of Two Principals," 64 Harv. L. Rev. 431 (1951). But our Supreme Court has not yet approved such a division.
Whatever the descriptive adjective to describe the jural relationship, Restatement of Agency 2d makes no statement as to a rule which determines who shall bear the loss where two or more persons make use of the services of one who is an agent for more than one and who, without being authorized to do so, conducts what purports to be a transaction between them and because of the dual relationship is enabled to embezzle from one of them.
National Premium supplied forms and information, service and money to Martone, who also was the agent of both the insured and the insurer. National Premium knew of this dual relationship. In a caveat to ง 313, the Restatement of Agency 2d suggests that it would be equitable and consistent with legal principles for the loss to be divided, such *225 as is frequently done where two or more persons are subject to a common obligation or lien. This principle, by which persons equally subject to a loss are required to bear equal burdens, is the basis of "general average" in maritime law and could, suggests the Restatement, be used to advantage in situations like this.
But how can the embezzler's knowledge be imputed more to one party than to the other? If one of the parties is more responsible for the situation than the other, why should not the loss be thrown on him? If one is more aware of the dual employment and the other less aware, it would not be unfair to make the former responsible?
National Premium was definitely aware of the danger of permitting Martone to occupy a dual or triple relationship. It is the existence of this relation which is responsible for the opportunity and for the temptation of the agent.
It is concluded that on the fraud count National Premium has failed to prove justifiable reliance; on the negligence count, defendant National Fire has successfully demonstrated the contributory negligence of National Premium.
On either theory advanced, National Premium cannot recover against National Fire.

III THE LIABILITY OF ROTHBERG
In order to inculpate defendant Rothberg plaintiff invokes the general rule that a partner is liable for the acts of his copartner committed within the scope of his authority, real or apparent, and within the scope of the partnership business. This rule, however, can only be applied if an actual partnership existed between Rothberg and Martone at the time of the latter's fraud.
N.J.S.A. 42:1-6 (1) defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." The question, therefore, is whether an "association" within the meaning of this statute arose *226 when Martone and Rothberg entered into an oral executory agreement to carry on a business as partners and filed a trade name certificate and an application for a real estate and insurance license in partial fulfillment of that agreement, no further action thereafter being taken. It should be noted here that the above definition is that given in the Uniform Partnership Act, which New Jersey has enacted. The Commissioners' note to ง 6 of the act fails to resolve the question posed, but does contain the following language:
"The words `to carry on as co-owners a business' remove any doubt in the following case: A and B sign partnership articles and make their agreed contributions to the common fund. A refuses to carry on business as agreed. Is there a partnership to be wound up in accordance with the provisions of Part VI `Dissolution of Winding-up'? The words quoted require an affirmative answer to this question. If the words `carrying on business' had been used, in the case given, no partnership would exist, and Part VI would not apply."
7 Uniform Laws Annotated, p. 11. This note has not been enacted into New Jersey law along with the body of the statute. Does this explanatory note apply to the relationship between Martone and Rothberg, and if so, what effect is to be given it in the interpretation of the statute?
N.J.S.A. 42:1-7 contains rules for determining the existence of a partnership. The statute does not purport to state all the indicia of partnership and is of little assistance in resolving the present question.
A number of recent New Jersey cases may be found dealing with whether or not a partnership existed in fact. None, however, is useful because their facts are far different from those presented here and also because those cases lack general statements which would furnish an analytical starting point. The older New Jersey cases shed somewhat more light upon the subject.
Before discussing them, however, the definition of the term given in Gilmore, Law of Partnership, p. 2 (1911), is historically instructive:
*227 "* * * the existence of a partnership is determined by the concurrence of several independent facts resulting from an agreement between the parties, such as, for example, the ownership of property in common, the joint ownership of capital, sharing of profits and losses arising from the use of common property or the prosecution of joint ventures, and the joint conduct of a business owned in common. The existence or nonexistence of certain of these elements constitutes tests by which the existence or nonexistence of a partnership is determined. Some of the difficulty in defining a partnership lies in the confusion that has existed in the courts as to which elements were necessary to constitute a partnership, varying tests have been applied from time to time.
The older definitions commonly speak of partnership as a contract. This is not quite accurate. Partnership is a relation existing between persons. It is true that that relation arises out of a contract; that a partnership does not arise except by agreement; but the term is used to describe the relation that results, and not the contract from which it arises. The contract may be express or implied. If not expressed, its terms are determined from all the acts of the parties.
The basis of a partnership is a business enterprise; without it there can be no partnership * * *."
It should be noted that these assertions were advanced at the latest in 1911, preceding the approval by the Commissioners on Uniform Laws of the Uniform Partnership Act by three years.
None of the older New Jersey cases about to be discussed concludes the question whether Martone and Rothberg were partners; however, they contain general statements relating to the nature of a partnership which may be useful in solving the problem. It should be noted that the Uniform Partnership Act was adopted in New Jersey in 1919. Also, the importance of cases cited in which the question was whether the parties were partners inter se should not be discounted solely on that ground, since N.J.S.A. 42:1-7 (1) provides, "Except as provided by section 16 persons who are not partners as to each other are not partners as to third persons."
The opinion in Silberman v. Angert, 101 N.J. Eq. 477 (Ch. 1927), omitted to delineate the facts, except for the statement that the action was for an "accounting of profits derived from the sale of real estate under a verbal agreement." Then followed:
*228 "The elements necessary to create a general partnership are lacking. There was no partnership name, no stationery of the alleged partnership, no joint office and no joint bank account." (at p. 477)
While recognizing that the evidence showed "the parties did in a few instances enter into complete joint ventures," the Court quoted paragraphs (2) and (3) of the present N.J.S.A. 42:1-7 in support of its holding that even this evidence did not of itself establish a partnership. Thereafter, the court said (at p. 478): "The deal in question is at best a joint venture, and the evidence indicates that while contemplated it was never concluded."
Hartman v. Woehr, 18 N.J. Eq. 383 (Ch. 1867), was an action for dissolution of a partnership, an accounting of profits, and payment to the plaintiff of his proportionate share of the profits and property of the partnership. Defendants denied the existence of a partnership. The court held that a partnership existed on facts showing that while plaintiff had failed to make his full capital contribution, buildings were erected, business was commenced and articles of partnership were drawn but not signed, although it was admitted that with one here irrelevant exception they embodied the actual agreement of the parties. The relevant language of the court was:
"The existence of partnership does not depend upon the fact that each partner has, in all things, complied with his agreement. If the contract has been made, property and labor contributed, and the partnership business commenced or carried on to any extent, there is a partnership." (at p. 385)
DeVita v. Loprete, 75 N.J. Eq. 418 (Ch. 1909), affirmed on other grounds 77 N.J. Eq. 533 (E. & A. 1910), is among that class of cases in which the partnership agreement contained a feature treated by the court as a condition precedent. DeVita, M. Loprete and D. Loprete agreed in writing that if before a certain date any of them should obtain a garbage removal contract from East Orange, "he or they will admit to a full one-third share of the profits of such contract the *229 other party or parties to the agreement." M. Loprete also agreed to sell to the partnership "hereby constituted" equipment owned by him necessary to carry on the business. When M. Loprete in fact obtained the contract, he refused to allow the others to participate in the business. DeVita brought an action for an accounting and the appointment of a receiver.
The court ruled as follows:
"It will be observed that the agreement of June 18th, 1903, is not an agreement whereby the three parties formed a partnership and constituted themselves present partners, but is rather an agreement contemplating the formation of a future partnership.
It is not always easy to determine when a contemplated partnership becomes a partnership in praesenti. The test usually applied to determine whether a partnership exists is by ascertaining from the terms of the agreement whether any time has to elapse or any act remains to be done before the right to share profits accrues * * * I think it clear that a partnership between the three parties cannot be said to have been consummated, and that the bill cannot in consequence be sustained as a bill filed by a partner for the enforcement of partnership rights." (75 N.J. Eq., at p. 421)
It should be noted that while the affirmance by the Court of Errors and Appeals was on other grounds, that court expressly stated that it did not disagree with the opinion below.
In Lang v. Hexter, 137 N.J. Eq. 100 (Ch. 1945) affirmed 138 N.J. Eq. 478 (E. & A. 1946), plaintiff sought a declaration of partnership between him and Hexter, who was deceased at the time of suit. In holding that plaintiff failed in his proof the court said:
"If this complainant was in fact a partner, verily he was a secret and silent one. The evidence does not disclose a single memorandum, a piece of stationery, book entry, bank account, sale or title to property, record of a distribution of earnings or of a contribution by the complainant to capital, loss or expense, or any contract with the manufacturer of the products or with the customers of the sales agency, or the commission of any act by the complainant in the exercise of mutual authority, from which a reliable inference of the alleged partnership between the complainant and the decedent can be confidently inferred." (137 N.J. Eq., at p. 104)
*230 While the facts of Hoffecker v. Austin, 82 N.J.L. 495 (E. & A. 1911) are uninstructive for present purposes, in answer to a contention that a partnership existed between certain individuals, the court said:
"There was no evidence of an express contract of partnership between the parties, nor of any joint ownership of partnership property, nor an agreement for the sharing of profits as such, nor proof of the acting of any one of the alleged partners for the others, or authority for so acting relative to partnership affairs. These are indicia and criteria of the existence of a partnership inter sese * * *
A partnership relation as between the alleged partners must be derived from and depend upon a contract." (at p. 497)
In Higgins v. Higgins, 266 Ala. 514, 97 So.2d 812 (Ala. Sup. Ct. 1957), two brothers signed written partnership articles in which they stated they "agree to become partners in the business of buying and selling groceries." Forrest Higgins was to contribute the land which would be the site of the business and Walter Higgins to erect the building in which to carry on the business, and also to furnish the equipment. The building was in fact erected but, as stated in the opinion filed by the trial court, the "venture seems to have been completely stillborn." A bill in equity sought dissolution and distribution. The Alabama Supreme Court affirmed the trial court's dismissal of the bill:
"The agreement made no provision for operating capital. When the parties realized that circumstance, neither of them was willing, or perhaps able, to supply such operating capital. Therefore the purpose of the agreement was never even begun. It is true, as argued, that there must be a dissolution of a partnership either by mutual consent of the parties or by a decree of a court of equity in order to support a partnership settlement * * * But the essentials necessary to the real purpose of the partnership were never completed and its operation never begun." (at p. 815)
And further:
"The contract, by its terms provides that the parties agree to become partners in the grocery business. The capital to consist of the site for the building, to be contributed by respondent, and the building *231 to be contributed by complainant. It was merely an agreement to form a partnership. But the partnership was not then created and never was created. It was an executory agreement never consummated * * * `As a partnership, it never acquired any property'. * * * The enterprise in which the parties were to engage must have been launched under the agreement before the parties became partners. * * * In the instant case before that occurred the purpose of the partnership was abandoned as manifested by the conduct of the parties * * *." (Ibid.)
There are a number of other cases in which the court denied the existence of an actual partnership on the basis that the enterprise had not been launched, but these are "pure" condition-precedent cases, i.e., the partnership could not come into existence until the occurrence of a specified event, or the development of a specified level of income, etc.
While no case directly in point is found, the authorities tend to indicate that the mere filing of a trade name certificate under an oral agreement to form a partnership does not in and of itself create a partnership relation between the signers of the certificate.
Assuming no partnership in fact is found, plaintiff's alternative argument is that a partnership by estoppel exists. The asserted estoppel is based upon N.J.S.A. 42:1-16, which provided in relevent part:
"When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made." (emphasis supplied)
It would seem that this section creates a requirement in all cases that the complaining party should have acted in reliance on the representation, whether the representation be made "in a public manner" or otherwise. It seems incomprehensible *232 that the underlined word "so" could have any referent other than the phrase "on the faith of such representation." National Premium, having had no knowledge of the trade name certificate and having relied exclusively on the acknowledgement card before issuing the checks to Price Agency, would appear to have no standing to assert the existence of the estoppel available under N.J.S.A. 42:1-16. There is disagreement, however, as to how these provisions should read, as will appear from a discussion of the following case.
In West Side Trust Co. v. Gascoigne, 39 N.J. Super. 467 (App. Div. 1956), relied upon by both plaintiff and defendant Rothberg, it was held that the filing of a trade name certificate was a representation in a "public manner." The author of the discussion of this case in 11 Rutgers L. Rev. 276, at p. 277, states that N.J.S.A. 42:1-16 was cited to the effect that one making a representation in a public manner that he was a partner would be liable to any subsequent lender, whether or not the lender knew of the representation. If this view of Gascoigne has merit, the holding of that case would contravene what appears to be the only reasonable construction the statutory language can bear. A careful analysis of the case is thus called for.
Gascoigne and one Jackson traded as partners under the name Jackson Contractors, from 1946 until September 1, 1949. The partnership having been dissolved, Gascoigne on the latter date filed a certificate indicating that he individually would carry on business under the former firm name. When he applied to plaintiff bank for a loan in June 1952 Gascoigne filled out a financial statement for Jackson Contractors indicating that the firm operated under a verbal partnership agreement and that Jackson was a "special partner." He left unanswered the request for the capital contributed by the partners, and the question seeking to learn the extent of the partner's liability for partnership debts. Despite the sentence printed on the form of the statement, "All Partners Should Sign When There Is No Written *233 Partnership Agreement," the signature was "Jackson Contractors, Arthur O. Gascoigne." On July 24, 1952 the bank loaned money evidenced by a note signed "Jackson Contractors, Arthur O. Gascoigne." On July 29, 1952 Gascoigne signed and on August 1 filed a certificate of dissolution of Jackson Contractors. On or about the latter date Gascoigne got Jackson to sign plaintiff bank's account card and a new trade name certificate as a partner in Jackson Contractors, which was filed on August 1. Next comes the most critical fact in the case: a copy of the trade name certificate and the firm account card were given to the bank.
Subsequently, on December 4, 1952 and March 6, 1953, further loans were made on two notes signed "Jackson Contractors, Arthur O. Gascoigne." Jackson was unaware of each of these loans and received none of the proceeds. The bank never sought clarification from Gascoigne of Jackson's connection with the partnership, nor did it direct any inquiry to Jackson himself. Eventually, suit was brought on the notes against both Jackson and Gascoigne. The latter not having answered, Jackson answered denying the existence of a partnership and alleging that the notes were Gascoigne's personal obligations. The trial court granted plaintiff's motion for summary judgment as to the second and third notes on the ground that the August 1 trade name certificate conclusively established under N.J.S.A. 42:1-16 a partnership by estoppel between Gastoigne and Jackson. The Appellate Division reversed, holding that under the circumstances the bank had a duty reasonably to inquire about Jackson's status.
As stated above, the Gascoigne case held that "the filing of the business name certificate * * * constituted a representation of partnership `in a public manner.'" However, since the bank had actually been furnished a copy of the trade name certificate, the question whether one who gives credit without relying on the public record of the certificate, who in fact knows nothing of such record, was not presented in Gascoigne. The actual decision in the case was embodied in the following language:
*234 "But section 16 of the act quoted does not create a conclusive estoppel in every situation and under all circumstances. If the person who extends credit knows, in spite of the representation, that there is in fact no partnership, or if he is made aware of facts which call for inquiry as to the verity of the representation and he fails to make a reasonably diligent investigation, the bar of the statute ought not to be applied." (at p. 473)
The trial court had held that even if there were a duty of reasonable inquiry upon the bank, the duly executed and filed trade name certificate relieved it of such obligation. The Appellate Division disagreed; it concluded that "we feel that it is for the jury to say whether the duty to make reasonable inquiry was eliminated by the presentation of the signature card and trade name certificate." (at p. 475)
Assuming that the author of the cited Rutgers Law Review article is correct when he says Gascoigne held that one making a representation in a public manner that he was a partner would be liable to any subsequent lender, whether or not the lender knew of the representation, then Gascoigne would stand for the following propositions, both at the same time:
(1) If X gives credit on a signature such as "Diogenes Co., by John Smith," not caring who comprises the firm, and only subsequently learns there is a trade name certificate showing Smith and Bill Jones as partners in Diogenes Co., X can hold Jones liable for the debt.
(2) If X gives credit on a signature such as "Diogenes Co., by John Smith," having actual knowledge of the same trade name certificate, but also having notice of facts which reasonably raise questions about the existence of a partnership in fact between Smith and Jones, he may not necessarily be able to hold Jones liable for the debt.
Thus, in proposition (1) where there was no knowledge of or reliance on the trade name certificate, liability ensued by virtue of the fact that it was recorded in a "public manner," but in proposition (2) even actual reliance on the same trade name certificate may not be sufficient to result in liability. It is inconceivable that Gascoigne can stand for these mutually contradictory propositions.
*235 Another case is found which clearly held that actual notice is not required if the trade name certificate is a public record. In Gilbert v. Howard, 64 N.M. 200, 326 P.2d 1085 (N. Mex. Sup. Ct. 1958), the plaintiff sought to hold two individuals liable as partners by estoppel under section 16 of the Uniform Partnership Act. There the court said:
"This section extends liability beyond the common-law test of reliance so that when one has by his acts or his consent to the acts of others allowed or caused the general community to believe that he is a partner then he is such by estoppel even though this particular creditor may not have heard the representation." (at p. 1087)
Earlier the Court had concluded that
"The statutory test for partnership by estoppel requires that (1) credit must have been extended on the basis of partnership representations or (2) that the alleged partner must have made or consented to representations being made in a public manner whether or not such representations were actually communicated to the person extending credit." (at p. 1086)
It should be noted that no discussion of the word "so" in section 16 was undertaken in the opinion, and further, that the defendant sought to be estopped from denying the partnership prevailed. The court held
"Since the representations were insufficient in law, had not been publicly made or relied upon at the time credit was extended, the defendant Moore could not have been a partner by estoppel." (at p. 1087)
Other cases discussing section 16 of the Uniform Partnership Act are generally to the effect that reliance is a necessary element in establishing a partnership by estoppel. Typical among these is Pruitt v. Fetty, 148 W. Va. 275, 134 S.E.2d 713 (W. Va. Sup. Ct. 1964), a negligence action against two individuals alleged to be operating as a partnership. After holding that no partnership in fact existed between the defendants, and that the doctrine of partnership by estoppel was inapplicable to purely tort actions, the court said:
*236 "Under the Uniform Partnership Act, it is also made clear that the doctrine of estoppel applies against a person who is not an actual partner of a partnership only when a third person relies on his conduct and gives credit to the partnership. Then, and only then, is such person liable under the doctrine of estoppel." (at p. 717)
Returning to the language of Gascoigne which call for "inquiry" (p. 473) as to the verity of the representation and the requirement of "a reasonably diligent investigation" (p. 473), it remains for the finder of the fact, here the court, to say "whether the duty to make reasonable inquiry was eliminated." Further, since plaintiff agrees that the appropriate agency principles must apply and that since the action against Rothberg is for fraud and deceit, "justifiable reliance" as expressed above by National Premium must be found.
National Premium extended the credit not to Price Agency or Rothberg but to Martone's fictitious assured. But it only did so after receiving and relying on the intercepted mail addressed to National Fire and the returned forged acknowledgment card. To examine the directory of New Jersey agents would have shown no listing for Price Agency. The one dollar inquiry to the Department of Banking and Insurance would have clearly demonstrated that Price Agency could not write for National Fire. The two transactions (Nos. 9 and 10), as detailed above, were frail on their face. Estoppel, whether by statute or decision, is based on equitable principles.
Having had the opportunity to observe the demeanor of Green and Rothberg and carefully weighed the credible assertions of each, there is no justification for imposing the loss resulting to National Premium upon Rothberg.

CONCLUSION
Having concluded that defendant Martone alone is responsible for damages to National Premium, the measure remains.
*237 Plaintiff asks for damages based upon the "benefit of the bargain," or the moneys given to Martone plus the 14.78% "service charge." Although the question of usury was not within the issues framed by the pretrial order, testimony was received as to the amount of profit on the issue of justifiable reliance and contributory negligence. National Premium had contended that its margin of profit was so meager that it could not make any inquiry of the assured or Martone Agency or the Price Agency. It further stated that it could not afford the small statutory fees to the Secretary of State or the Department of Banking and Insurance. The percentage of return speaks loudly in refutation.
To award damages which included the 14.78% would by implication grant court approval to an excessive rate of interest.
Zeliff v. Sabatino, 15 N.J. 70 (1954), holds that our courts are not wedded to either the "out-of-pocket" rule or to the "benefit of the bargain" standard. No rule of precise application can be laid down, the court said. It further held (at p. 74) that victims of fraud are entitled to compensation for every wrong which was the natural and proximate result of the fraud. In the present case justice requires only that plaintiff receive an award for its out-of-pocket monies to include interest at the legal rate of 6% from the date of the filing of the complaint, the earliest proven date of a demand for payment against Martone.
A judgment will be entered in favour of National Premium and against Martone in the sum of $214,058.07. A judgment will be entered in favour of National Fire and Edward Rothberg and against National Premium of no cause for action.
An appropriate form of judgment will be submitted, consented to as to form or to be settled on notice.